of the derivative nature of their claims. *In re Labatt Food Service, L.P.*, 279 S.W.3d 640 (Tex. 2009), 52 Tex. Sup. Ct. J. 352. In *Labatt*, the Court recognized that the Wrongful Death Act creates an entirely derivative cause of action for the beneficiaries of the decedent, thus binding the beneficiaries (the parents and children of decedent) to an arbitration agreement executed by the decedent. *Id.* The Texas Supreme Court has recognized six general theories that potentially can bind a non-signatory to an arbitration agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third-party beneficiary. *Id.* (*referencing In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005)). The federal common law also recognizes these theories to bind non-signatories to contracts as well. See *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381-82 (5th Cir. 2008) (citing *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003)).

15.    Recently, the United States Fifth Circuit Court of Appeals held that the wrongful death claims of the surviving spouse, mother, and children of decedent were subject to arbitration under federal common law. *Graves v. BP America, Inc.*, 568 F.3d 221 (5th Cir. 2009). In *Graves*, the plaintiffs sought recovery under the wrongful death and survival statutes and the defendants sought to enforce an arbitration provision in the decedent's employment contract. The district court ordered arbitration for the survival claim of the estate, but denied the motion to compel arbitration of the wrongful death claims. The Fifth Circuit reversed the trial court's ruling on the wrongful death claims and held that the wrongful death claims are derivative of the decedent's claim even though they are for the exclusive benefit of the beneficiaries. *Id.* at 223.

16.    In *Shanks v. Swift Transportation Co., Inc.*, 2008 WL 2513056 (S.D. Tex 2008), the Court held that the wrongful death and survival claims brought by the spouse and children of an employee killed in an work-related incident were subject to arbitration. The Court noted that

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
10/22/2015 10:38:05 PM
CHRISTOPHER A. PRINE
Clerk

although the spouse and children were non-signatories to the decedent's employment agreement, they were bound to the agreement based on equitable estoppel and third-party beneficiary theories. *Id.* at *4-5. The Court held all claims were subject to the arbitration agreement because the wrongful death claims (which were not bound by the agreement) were so "factually intertwined" with arbitrable claims. *Id.* at *10-11.

17.     In determining which "Company" the DRP applies to, the DRP provides that it applies to all subsidiaries of the Sponsor (Nabors Industries, Inc.), as well as any "Electing Entities. [16] The DRP also provides a description of the types of disputes to which it applies, including personal injury that occurs at the workplace or while the employee is in the course and scope of his employment. [17] Here, Nabors Well Services is a subsidiary of Nabors Industries, Inc. and, accordingly, the DRP is applicable to Nabors Well Services and its employees, including Aviles.[18]     Moreover, Buffco became an Electing Entity, electing to be bound by the terms of the DRP in April, 2007 when it entered into a drilling contract with Nabors Well Services.[19]

---

[16] "Company" means Sponsor and every *direct or indirect subsidiary (whether a corporation, limited liability company, company partnership or other legal entity) of Sponsor*, any Electing Entity, any entity or person alleged to have joint and several liability concerning any Dispute, and all of their directors, officers, employees, and agents, every plan of benefits, whether or not tax-exempt, established or maintained by any such entity, the fiduciaries, agent and employees of such plans, and the successors and assignees of such entities, plans or persons; provided, however, *that in the case of an Electing Entity, "Company" shall include the Electing Entity only to the extent provided in the Electing Entity's agreement to be bound by the Program.* (emphasis added). *See* Exhibit 1, Attachment 1 at ¶ 2(D).

[17] "Dispute" means all legal and equitable claims, demand and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by an agreement to resolve Disputes under the Program, or between a person bound by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to...6. *any personal injury allegedly incurred in or about a Company Workplace or in the course and scope of an Employee's employment.* (emphasis added) *See* Exhibit 1, Attachment 1 at ¶ 2(E).

[18] *See* Affidavit of Laura Doerre, attached as Exhibit 4.

[19] *See* Contract, Ex. 2 at "Exhibit C" at ¶ 17; *See also,* Exhibit 3.

353

18. As noted several times herein, whether Plaintiffs are non-signatories to the DRP is without consequence given the language of the DRP (i.e., contractually extending to heirs and beneficiaries), the applicable case law (i.e., *Graves*, *LaBatt* and *Shanks*) extending applicability to non-signatories), and the evidence presented herein (i.e., establishing Nabors and Buffco as well as Plaintiffs as subject to the DRP).

## The DRP Does Not Exclude the Minor's Claims

19. Plaintiffs argue that the DRP is inapplicable to the minor's claims because they are brought in a representative capacity. Plaintiffs' reference to section 4(B) of the DRP as the basis for this assertion is clearly misguided. A simple reading of section 4(B) reveals only that that the DRP contemplates arbitrating each "Dispute" on an individual basis, rather than in a class action setting. Such provision obviously does not preclude arbitrating the minor's dispute simply because it is brought by her mother.

## The Workers Compensation Exclusion in the DRP is Not Applicable to Plaintiffs' Claims

20. The DRP excludes from its purview all claims for workers compensation. Workers Compensation benefits are not involved in this lawsuit.[20] Plaintiffs' claims against Nabors are not created or enumerated in, and do not derive from the Texas Workers Compensation Act. Rather, the gross negligence claims provided by statute or common law are merely preserved by the TWCA, while claims for general negligence are barred by the TWCA.[21] As such, Plaintiffs' claims against Nabors are not workers compensation claims, and are not excluded from the applicability of the DRP.

---

[20] *See* Exhibit 1, Attachment 1 at ¶ 3(D)
[21] *See* Texas Labor Code § 408.001

## The DRP Is Not Illusory, Unconscionable, or Lacking Mutual Assent

21. Any contention that the DRP is illusory or unconscionable flies in the face of the contractual language within the DRP and the acknowledgements and notices that Decedent executed. Specifically, Nabors would again point out that the DRP expressly extends to the heirs and beneficiaries of Nabors' employees.[22] Additionally, the Nabors DRP has been upheld as not illusory, and valid and enforceable. *Nabors Drilling USA, LP v. Carpenter*, 198 S.W.3d 240, 249 (Tex. App.—San Antonio 2006, orig. proceeding).

22. Moreover, any assertion that the DRP fails to make provision for notifications of amendments to the DRP is completely wrong. Section 6(B) of the DRP – "[The DRP] may be amended by [Nabors Industries, Inc.] by giving at least 10 days' notice to current Employees." Thus, it cannot be said that Nabors keeps its employees in the dark when amendments are made to the DRP as any amendments to the DRP were conditioned upon notice to the employees.

23. Finally, whether an entity becomes or drops out as an "Electing Entity" subject to the DRP is irrelevant in relation to the forum in which an employee's claim (or heirs/beneficiaries in this case) is litigated. Each time Decedent executed one of the referenced acknowledgments or notices, he agreed that any claim he (or heirs/beneficiaries in this case) made against his employer or against an "Electing Entity" could always be made subject to arbitration. This possibility was specifically included in his application and/or commencement of employment forms and became part of the enforceable arbitration provisions of the DRP.

24. For these reasons, the DRP is not illusory or unconscionable. Employees are notified of amendments as they arise. Employees such as Decedent acknowledge many times the possibility that any claim they make against Nabors or an "Electing Entity" could be compelled

---

[22] *See* Exhibit 1, Attachment 1 at ¶ 3(B).

355

to arbitration. The employees accept the DRP as a term of their employment as supported under Texas law.

## CONCLUSION

25. In summary, Texas courts recognize that arbitration agreements in an at-will employment setting apply to personal injury claims. Nabors Industries, Inc. has instituted a comprehensive dispute resolution program designed to provide a means for the quick, fair, accessible, and inexpensive resolution of disputes between Nabors' employees on the one hand and Nabors, its subsidiaries (i.e., Nabors Well Services Ltd.), and its "Electing Entities" (i.e., Buffco) on the other hand. The Fourth Court of Appeals in *Nabors Drilling USA, LP v. Carpenter*, 198 S.W.3d 240, 249 (Tex. App.—San Antonio 2006, orig. proceeding), has previously determined the Nabors' DRP to be valid and enforceable. Through Decedent's acceptance and/or continued employment with Nabors and through Decedent's express written assent, Plaintiffs gross negligence, survival and wrongful death claims are bound by the DRP with respect to resolving their claims against Nabors and Buffco.

26. Nabors has shown that the DRP includes a valid agreement to arbitrate and that the dispute in this case falls within the scope of that arbitration agreement. Further, Decedent's acceptance and/or continued employment served as the consideration necessary to make the agreement enforceable. This enforceability extends to the claims Decedent's heirs (i.e., Plaintiffs) assert in this suit, including those claims against Nabors. The DRP is neither illusory nor unconscionable. The defensive actions Nabors has employed thus far in this litigation have been merely peripheral in nature and have not unfairly prejudiced Plaintiffs. Such defensive actions would have been undertaken regardless of the forum in which this case was litigated.

356

## PRAYER

For the these reasons, Nabors and Buffco ask the Court to grant this motion, abate or dismiss this action, and order that all claims Plaintiffs assert in their suit be compelled to final and binding arbitration. Nabors and Buffco further ask for all other relief to which they are entitled.

Respectfully submitted,

Thomas J. Smith
  State Bar No. 00788934
Patrick W. Drouilhet
  State Bar No. 00783985
Ron T. Capehart
  State Bar No. 24009939
GALLOWAY, JOHNSON, TOMPKINS
  BURR & SMITH
1301 McKinney, Suite 1400
Houston, Texas 77010
(713) 599-0700 – telephone
(713) 599-0777 – facsimile

ATTORNEYS FOR DEFENDANT, NABORS
WELL SERVICES LTD. AND BUFFCO
PRODUCTION, INC.

357

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon the following counsel via certified mail, return receipt requested the 18th day of November, 2009.

*CM/RRR 91 7108 2133 3935 9627 1965*
Chris Jones, Esq.
JONES & JONES, L.L.P.
420 N. Green Street, Suite C
Longview, Texas 75601

*CM/RRR 91 7108 2133 3935 9627 1958*
Val Jones, Esq.
THE JONES FIRM
109 West Austin
Marshall, Texas 75670-3340

*CM/RRR 91 7108 2133 3935 9627 1941*
Barry L. Hardin
David, Goodman & Madole,
A Professional Corporation
5420 LBJ Freeway, Suite 1200
Dallas, Texas 75240

*CM/RRR 91 7108 2133 3935 9627 1934*
J. Devin Alsup
Lynch, Chappell & Alsup
300 N. Marienfeld, Suite 700
Midland, Texas 79701

*CM/RRR 91 7108 2133 3935 9627 1927*
William Cornelius
Wilson, Robertson & Cornelius
P.O. Box 7339
Tyler, Texas 75711

*CM/RRR 91 7108 2133 3935 9627 1910*
Francis H. "Rasch" Brown, III
FRILOT L.L.C.
1100 Poydras Street, Suite 3600
New Orleans, LA 70163-3600

Thomas J. Smith
Pat Drouilhet
Ron T. Capehart

358

| | | |
|---|---|---|
| BRENDA AVILES, Individually and on behalf of Redacted , a minor child, and on behalf of the Estate of VICTOR FILOMENO AVILES | § § § § § | IN THE DISTRICT COURT<br><br>PANOLA COUNTY, TEXAS |
| V. | § § § § § | |
| NABORS WELL SERVICES CO. | § | 123RD JUDICIAL DISTRICT |

## BUSINESS-RECORD AFFIDAVIT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned notary, on this day personally appeared Frank Labrenz, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

1.  "My name is Frank Labrenz. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.  I am the Vice President-Personnel Services for Defendant, Nabors Well Services Ltd. ("NWSL") and the duly authorized agent and custodian of records for Nabors, in the above-entitled and numbered cause.

3.  Attached to this affidavit are records from NWSL, specifically:

     a.  Full and complete Nabors Dispute Resolution Program (English version) in effect on August 20, 2007;

     b.  Full and complete Nabors Dispute Resolution Program (Spanish version) with supplement that was in effect on August 20, 2007;

     c.  Employee Notice of Dispute Resolution Program (Spanish version);

     d.  Questions and Answers for Nabors Dispute Resolution Program (English version);

     e.  Questions and Answers for Nabors Dispute Resolution Program (Spanish version);

     f.  January 17, 2007 Supplement to the Spanish Version of the Dispute Resolution Program; and

     g.  Excerpts from the personnel file of Victor Aviles.

359

EXHIBIT

1

4.    Documents (a) through (f) above were provided to all NWS employees through various delivery methods and were available to all NWS employees.

5.    These attached records are kept by NWS in the regular course of business, and it was in the regular course of business of NWS for an employee or representative of NWS, with knowledge of the act, event, condition, opinion, or diagnosis that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act, event, condition, opinion, or diagnosis that was recorded. The records attached to this affidavit are the originals or exact duplicates of the originals."

FURTHER AFFIANT SAYETH NOT.



FRANK LABRENZ


THE STATE OF TEXAS          §
                            §
COUNTY OF HARRIS            §


Sworn to and subscribed before me by _Frank Labrenz_ on the _13_ day of November, 2009.

Shelia M. McGee
Notary Public, State of Texas
My Commission Expires
August 23, 2011

Notary Public in and for the State of Texas
My Commission expires:

_8-23-11_

360



| SUBJECT | SECTION – MISCELLANEOUS | NUMBER – 200.80.1 | PAGE - 1 of 15 |
|---|---|---|---|
| EMPLOYEE DISPUTE RESOLUTION PROGRAM | EFFECTIVE DATE - January 27, 2007 | SUPERCEDES ISSUE DATED – January 1, 2002 | |

1. **Purpose and Construction**

The Program is designed to provide a means for the quick, fair, accessible, and inexpensive resolution of Disputes between the Company and the Company's present and former Employees and Applicants for employment, related to or arising out of a current, former or potential employment relationship with the Company. The Program is intended to create an exclusive procedural mechanism for the final resolution of all Disputes falling within its terms. It is not intended either to abridge or enlarge substantive rights available under applicable law. The Program contractually modifies the "at-will" employment relationship between the Company and its Employees, but only to the extent expressly stated in the Program. The Program should be interpreted in accordance with these purposes.

2. **Definitions**

A. "AAA" means the American Arbitration Association.

B. "JAMS" means Judicial Arbitration and Mediation Services.

C. The "Act" means the Federal Arbitration Act, 9 U.S.C.§1, et seq., as amended from time to time.

D. "Company" means Sponsor and every direct or indirect subsidiary (whether a corporation, limited liability company, company partnership or other legal entity) of Sponsor, any Electing Entity, any entity or person alleged to have joint and several liability concerning any Dispute, and all of their directors, officers, employees, and agents, every plan of benefits, whether or not tax-exempt, established or maintained by any such entity, the fiduciaries, agents and employees of all such plans, and the successors and assigns of all such entities, plans and persons; provided, however, that in the case of an Electing Entity, "Company" shall include the Electing Entity only to the extent provided in the Electing Entity's agreement to be bound by the Program.

E. "Dispute" means all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by an agreement to resolve Disputes under the Program, or between a person bound by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to:

1. this Program;

2. the employment or potential reemployment of an Employee, including the terms, conditions, or termination of such employment with the Company;

**EXHIBIT**

Att. "A"


3.    employee benefits or incidents of employment with the Company;

4.    any other matter related to or concerning the relationship between the Employee and the Company including, by way of example and without limitation, allegations of: discrimination based on race, sex, religion, national origin, age, veteran status or disability; sexual or other kinds of harassment; workers' compensation retaliation; defamation; infliction of emotional distress, antitrust claim concerning wages or otherwise, or status, claim or membership with regard to any employee benefit plan;

5.    an Applicant's application for employment and the Company's actions and decisions regarding such application; and

6.    any personal injury allegedly incurred in or about a Company workplace or in the course and scope of an Employee's employment.

"Dispute" includes all such matters regardless of when the events on which they are based occurred, including matters based on events occurring before the Employee became subject to this Program (so long as such disputes were not previously asserted in a judicial forum) or after termination of the employment relationship.

F.    "Electing Entity" means any legal entity that has agreed to be bound by the Program as provided herein.

G.    "Employee" means any person who is or has been in the employment of the Company on or after the effective date of this Program, whether or not employed at the time a claim is brought with respect to a Dispute, residing in the United States, or otherwise subject to the laws of the United States or any state, municipality, or other political subdivision of the United States.

H.    "Applicant" means any person who is seeking or has sought employment with the Company after the effective date of this Program.

I.    "Party" means, with respect to a particular Dispute, affected persons and/or entities bound by this Program.

J.    "Program" means this Nabors Dispute Resolution Program, as amended from time to time.

K.    "Rules" means the Nabors Dispute Resolution Rules, as amended from time to time, which are applicable to mediation and arbitration.

L.    "Sponsor" means Nabors Industries, Inc., a Delaware corporation.

362



3. **Name, Application and Coverage**

A.    The Program shall be referred to as the "Nabors Dispute Resolution Program." Alternatively, it may be referred to as the "Dispute Resolution Program."

B.    Until revoked by Sponsor pursuant to this Program, this Program applies to and binds the Company, each Employee and Applicant and the heirs, beneficiaries and assigns of any such person or entity; provided, however, that this Program shall not apply to any Employee in a unit of Employees represented by a labor organization, or to the Company with respect to such employees, except to the extent permitted in an applicable collective bargaining agreement or lawfully imposed by the Company when no collective bargaining agreement is in effect.

C.    Except as provided for herein, this Program applies to any Dispute.

D.    Notwithstanding anything to the contrary in this Program, the Program does not apply to claims for workers' compensation benefits or unemployment compensation benefits.

E.    Mediation and arbitration are only available for Disputes involving legally protected rights.

F.    Notwithstanding any other provision hereof, any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met pending the institution of proceedings under the Program. Furthermore, an action under The Limitation of Ship Owners Liability Act, 46 U.S.C. §§ 181-189, shall not be subject to this Program.

4. **Resolution of Disputes**

A.    All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Program and the Rules. The Parties forego any right either may have to a jury trial on claims relating in any way to any Dispute.

B.    Each Dispute shall be arbitrated on an individual basis. The Parties forego and waive any right to join or consolidate claims in arbitration with others or to make claims in arbitration as a representative or as a member of a class or in a private attorney general or similar capacity, unless such procedures are agreed to by all Parties. Neither the Company nor any Employee or Applicant may pursue any Dispute on a class action, collective action or consolidated basis or in a representative capacity on behalf of other persons or entities who are claimed to be similarly situated, or participate as a class member in such a proceeding. The arbitrator in any proceeding under this Program shall have no authority to conduct the matter as a consolidated, class, collective or representative action.

C.    If the procedural limitation in Paragraph B of this Section is held unenforceable by a court in a proceeding in which a party seeks to pursue a consolidated, class or

363



collective action or otherwise act in a representative capacity, then this Program shall apply to such proceeding only to the following extent. The court will decide whether the Dispute should proceed on a consolidated, class, collective or other representative basis and, if so, will define the scope of the class. None of the foregoing determinations shall be submitted to the arbitrator, and in no event shall the arbitrator have the power to determine class, collective or representative action certification. The court's decisions will be subject to appeal pursuant to the applicable rules of procedure. If the court certifies a class, collective or other representative action, then all other determinations in or related to the Dispute shall be made by the arbitrator. The arbitrator shall determine questions of liability to or of the class as a whole and remedies available to or from the class as a whole. The arbitrator shall also decide the relief, if any, to which a party or class member may be entitled individually. If the court, however, ultimately denies a party's request to proceed on a consolidated, class, collective or representative basis, then that party's individual claim(s) shall still be subject to this Program and referable to arbitration pursuant to its terms.

## 5. No Retaliation

No employee shall be subject to any form of discipline or retaliation for initiating or participating in good faith in any process or proceeding under this Program.

## 6. Amendment

A. This Program may be amended by Sponsor at any time by giving at least 10 days' notice to current Employees. However, no amendment shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules, unless otherwise agreed.

B. Sponsor may amend the Rules at any time by serving notice of the amendments on AAA and JAMS. However, no amendment of the Rules shall apply to a Dispute for which a proceeding has been initiated pursuant to the Rules unless otherwise agreed.

## 7. Termination

This Program may be terminated by Sponsor at any time by giving at least 10 days' notice of termination to current Employees. However, termination shall not be effective as to Disputes for which a proceeding has been initiated pursuant to the Rules prior to the date of termination unless otherwise agreed.

## 8. Applicable Law

A. The Act shall apply to this Program, the Rules, and any proceedings under the Program or the Rules, including any actions to compel, enforce, vacate or confirm proceedings, awards, orders of an arbitrator, or settlements under the Program or the Rules.

B. All arbitrations held pursuant to this Program shall be convened as near as possible to the worksite where the events in dispute occurred if Nabors continues to perform


work at that location. Otherwise the arbitration will occur at the place most convenient for the majority of the witnesses.

C. Other than as expressly provided herein, or in the Rules, the substantive legal rights, remedies, and defenses of all Parties are preserved. In the case of arbitration, the arbitrator shall have the authority to determine the applicable law and to order any and all relief, legal or equitable, which a Party could obtain from a court of competent jurisdiction on the basis of the claims made in the proceeding.

D. Other than as expressly provided herein, or in the Rules, the Program shall not be construed to grant additional substantive, legal, or contractual rights, remedies or defenses which would not be applied by a court of competent jurisdiction in the absence of the Program.

E. Notwithstanding the provisions of the preceding subsection, in any proceeding before an arbitrator, the arbitrator, in his or her discretion, may allow a prevailing Employee or Applicant a reasonable attorney's fee as part of the award. The discretion to allow an award of fees under this subsection is in addition to any discretion, right or power which the arbitrator may have under applicable law. If the arbitrator awards attorney fees without authorization for such an award by statute or contract, such award will be limited to $2,500.00.

9. **Administrative Proceedings**

A. This Program shall apply to a Dispute pending before any local, state or federal administrative body or court unless prohibited by law.

B. Participation in any administrative or judicial proceeding by the Company shall not affect the applicability of the Program to any such Dispute upon termination of the administrative or judicial proceedings. A finding, recommendation or decision by an administrative body on the merits of a Dispute shall have the same legal weight or effect under the Program as it would in a court of competent jurisdiction.

10. **Exclusive Remedy**

Proceedings under the Program shall be the exclusive, final and binding method by which Disputes are resolved.

11. **Electing Entities**

A. Corporations or other legal entities, not otherwise Parties, may elect to be bound by this Program by written agreement with Sponsor.

B. Election may be made only as to some types of Disputes, or only as to some persons, in the discretion of Electing Entity.

12. **Effective Date**

The effective date of this Program shall be April 15, 2001.


### 13. Severability

The terms of this Program and the Rules are severable. The invalidity or unenforceability of any provision therein shall not affect the application of any other provision. Where possible, consistent with the purposes of the Program, any otherwise invalid provision of the Program or the Rules may be reformed and, as reformed, enforced.

### 14. Assent

Employment or continued employment after the Effective Date of this Program constitutes consent by both the Employee and the Company to be bound by this Program, both during the employment and after termination of employment. Submission of an application, regardless of form, for employment constitutes consent by both the Applicant and the Company to be bound by this Program.

366


## NABORS DISPUTE RESOLUTION RULES

1. **Definitions**

   All definitions included in the Nabors Dispute Resolution Program apply to these Rules.

2. **Application**

   A.  If different rules are applicable to a specific class of Disputes, and have been adopted by Sponsor and served on AAA or JAMS, these Rules shall not apply to such class of Disputes.

   B.  These Rules apply in the form existing at the time proceedings are initiated under them.

   C.  To the extent consistent with these Rules, the Employment Dispute Resolution Rules of AAA or JAMS also apply to all proceedings governed by these Rules.

3. **Initiation of the Process**

   A.  A Party may initiate proceedings under these Rules at any time, subject to any defenses including those applicable to the timeliness of the claim, including limitations and laches.

   B.  A Party may initiate proceedings by serving a written request to initiate proceedings on AAA or JAMS, and tendering the appropriate administrative fee.

   C.  Copies of the request shall be served on all other Parties to the Dispute by AAA or JAMS. The request shall describe the nature of the Dispute, the amount involved, if any, the remedy sought, and the proceeding locale requested.

   D.  Proceedings may also be initiated by an Employee or Applicant by serving a written request to initiate proceedings on the Company's Dispute Resolution Program Administrator. In such a case, the Company shall promptly forward any properly served request it has received to AAA or JAMS.

   E.  Parties against whom a claim is asserted shall file an answering statement within 21 days of receiving notice of intent to arbitrate or a specification of claims, which shall include any counterclaims and any request that the arbitrator (if any) prepare a statement of reasons for the award.

4. **Administrative Conference**

   AAA or JAMS shall convene an administrative conference as soon as possible after receipt of the answering statement or after expiration of the time for filing an answering statement if one has not been filed. The conference may be held in person or by telephone. At the conference, AAA or JAMS will determine whether the Parties are in agreement on a method to resolve the Dispute. If the Parties are in agreement, AAA or JAMS will implement the

367


procedure in accordance with their rules upon payment of any applicable fee. If the Parties cannot agree, or if the Parties have previously attempted and failed to resolve the Dispute by mediation or another nonbinding mechanism, the Dispute shall be arbitrated under these Rules.

### 5. Appointment of Arbitrator

Immediately after payment of the arbitration fee, AAA or JAMS shall simultaneously send each Party an identical list of names of persons chosen from a panel of qualified arbitrators which AAA or JAMS shall select and maintain. Each Party to the Dispute shall have fourteen (14) days from the transmittal date to strike any names objected to, number the remaining names in order of preference, and return the list to AAA or JAMS. If a Party does not return the list within the time specified, all persons therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the order of mutual preference, AAA or JAMS shall invite the acceptance of the arbitrator or arbitrators to serve. In those cases where more than $2,000,000 is in controversy, either Party shall have the right to require that the arbitration proceed before a three member panel rather than a single arbitrator. The Party who elects for a panel in these circumstances shall notify the other Parties during the administrative conference described in Section 4 of the Program. Any Party shall have the right to strike one list of arbitrators in its entirety. When a Party exercises this right, AAA or JAMS shall issue a new list of arbitrators consistent with the above procedures.

### 6. Qualifications of the Arbitrator

No person shall serve as an arbitrator in any matter in which that person has any financial or personal interest. Prior to accepting appointment, the prospective arbitrator shall disclose any circumstance likely to prevent a prompt hearing or create a presumption of bias. Upon receipt of such information from the arbitrator or any other source, AAA or JAMS will either replace that person or communicate the information to the Parties for comment. Thereafter, AAA or JAMS may disqualify that person, and its decision shall be conclusive.

### 7. Vacancies

If a vacancy occurs for any reason or if an appointed arbitrator is unable to serve promptly, the appointment procedure in Section 5 shall apply to the selection of a substitute arbitrator.

### 8. Date, Time and Place of Hearings

A. The arbitrator shall set the date, time and place of any proceeding pursuant to the requirements of Section 8B of the Program.

B. Notice of any hearing shall be given at least ten (10) days in advance, unless the arbitrator determines or the Parties agree that a shorter time is necessary.

C. The arbitrator shall make every effort, without unduly incurring expense, to accommodate the Employee or Applicant in the selection of a proceeding location.

368


9. **Conferences**

At the request of AAA or JAMS, or of a Party or on the initiative of the arbitrator, the arbitrator or AAA or JAMS may notice and hold conferences for the discussion and determination of any matter which will expedite the proceeding, including:

A.  venue,

B.  clarification of issues,

C.  determination of preliminary issues, including summary determination of dispositive legal issues,

D.  discovery,

E.  the time and location of proceedings or conferences,

F.  interim legal or equitable relief authorized by applicable law,

G.  pre- or post-hearing memoranda,

H.  stipulations; and/or

I.  any other matter of substance or procedure.

10. **Mode of Hearings and Conferences**

In the discretion of the arbitrator or by agreement of the Parties, conferences and hearings may be conducted by telephone or by written submission, as well as in person.

11. **Pre-hearing Discovery**

A.  On any schedule determined by the arbitrator, each Party shall submit in advance the names and addresses of the witnesses it intends to produce and any documents it intends to present.

B.  The arbitrator shall have discretion to determine the form, amount and frequency of discovery by the Parties.

C.  Discovery may take any form permitted by the Federal Rules of Civil Procedure, as amended from time to time, subject to any restrictions imposed by the arbitrator.

12. **Representation**

Any Party may be represented by counsel or by any other authorized representative.

13. **Attendance at Hearings**

The arbitrator shall maintain the privacy of the proceedings to the extent permitted by law. Any person having a direct interest in the matter is entitled to attend the proceedings.

369



The arbitrator shall otherwise have the power to exclude any witness, other than a Party or other essential person, during the testimony of any other witness. The arbitrator shall determine whether any other person may attend the proceeding. Upon the request of any Party, the arbitrator shall exclude any witness during the testimony of any other witness.

### 14. Postponement

A. The arbitrator, for good cause shown by a Party, or on agreement of the Parties, may postpone any proceeding or conference.

B. The pendency of court proceedings related to the same matter is not good cause for postponement.

### 15. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if required by law or requested by any Party, shall do so.

### 16. Record of Proceedings

There shall be no stenographic, audio, or video record of the proceedings unless either requested by one of the Parties or specified by the arbitrator. The Party requesting the record shall bear the entire cost of producing the same. Copies of the record shall be furnished to all other Parties upon request and upon payment of the cost of reproduction.

### 17. Procedure

The proceedings shall be conducted by the arbitrator in whatever order and manner will most expeditiously permit full presentation of the evidence and arguments of the Parties.

### 18. Arbitration in the Absence of a Party

The arbitrator may proceed in the absence of Parties or representatives who, after due notice, fail to be present or fail to obtain a postponement. An award shall not be made solely on the default of a Party. The arbitrator shall require any Party who is present to submit such evidence as the arbitrator may require for the making of an award.

### 19. Evidence

A. The arbitrator shall be the sole judge of the relevancy, materiality, and admissibility of evidence offered. Conformity to legal rules of evidence shall not be necessary.

B. The arbitrator may subpoena witnesses or documents at the request of a Party or on the arbitrator's own initiative.

C. The arbitrator may consider the evidence of witnesses. by affidavit or declaration, but shall give it only such weight as the arbitrator deems appropriate after consideration of any objection made to its admission.

370



### 20. Post-Hearing Submissions

All documentary evidence to be considered by the arbitrator shall be filed at the hearing unless the arbitrator finds good cause to permit a post-hearing submission. All Parties shall be afforded an opportunity to examine and comment on any post-hearing evidence. The arbitrator shall permit the filing of post-hearing briefs at the request of a Party and shall determine the procedure and timing of such filings.

### 21. Closing and Reopening of Proceedings

A. When the arbitrator is satisfied that the record is complete, including the submission of any post-hearing briefs or documents permitted by the arbitrator, the arbitrator shall declare the proceeding closed.

B. The proceeding may be reopened on the arbitrator's initiative or upon application of a Party at any time before the award is made.

### 22. Waiver of Procedures

Any Party who fails to object in writing, after knowledge that any provision or requirements of these procedures and Rules have not been complied with, shall be deemed to have waived the right to object.

### 23. Service of Notices and Papers

Any papers, notices, or process necessary or proper for the initiation or continuation of any proceeding under these Rules (including the award of the arbitrator, any court action in connection therewith, or the entry of judgment on an award made under these procedures) may be served on a Party by mail addressed to the Party or his or her representative at the last known address or by personal service. AAA, JAMS, the Parties, and the arbitrator may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give any notices required by these Rules.

### 24. Communications with the AAA, JAMS and the Company

A. Any Party may notice, serve or communicate with AAA by contacting:

Regional Administrator
American Arbitration Association
1001 Fannin St., Suite 1005
Houston, Texas 77002
(713) 739-1302
Fax: (713) 739-1702

371


B.	Any Party may notice, serve or communicate with JAMS by contacting:

JAMS
345 Park Avenue, 8th Floor
New York, NY 10154
(212) 751-2700
Fax: (212) 751-4099

C.	Any notice, service or communication with the Company will be to:

Legal Department
Nabors Industries, Inc.
515 West Greens Road, Suite 1200
Houston, Texas 77067-4525
(281) 874-0035
FAX: (281) 775-8431

## 25. Communication with the Arbitrator

There shall be no communication between the Parties and the arbitrator other than at any oral hearings or conferences. Any other oral or written communications from the parties to the arbitrator shall be directed to the AAA or JAMS (and copied to the Parties) for transmission to the arbitrator, unless the Parties and the arbitrator agree otherwise.

## 26. Time of Award

The award shall be promptly made by the arbitrator, unless otherwise agreed by the Parties or specified by applicable law, no later than thirty (30) days from the date of the closing of the proceeding or, if applicable, the closing of a reopened proceeding.

## 27. Form of Award

The award shall be in writing and shall be signed by the arbitrator. The arbitrator shall write a statement of reasons for the award if requested to do so in the request to initiate proceedings or in the answering statement. The award shall be executed in any manner required by applicable law.

## 28. Modification of Award

On order of a court of competent jurisdiction, or on agreement of the Parties, the arbitrator shall modify any award. The arbitrator may modify an award on the motion of a Party if the arbitrator finds that the award, as rendered, is ambiguous or defective in form, or if the award requires an illegal or impossible act. These are the only circumstances under which an arbitrator shall have jurisdiction to withdraw or modify an award.


### 29. Settlement

If the Parties settle their Dispute during the course of the arbitration, the arbitrator may set out the terms of the settlement in a consent award.

### 30. Scope of Arbitrator's Authority

A. The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law, including that related to the allocation of the burden of proof, as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief that is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Program and Rules.

B. The arbitrator shall not have the power to hear any claims in arbitration as a class or collective action, or in a private attorney general or similar capacity, or on any other representative capacity basis, or, absent the consent of all parties, on a consolidated basis. The arbitrator shall be authorized to decide only the disputed claims between the individual parties.

### 31. Judicial Proceedings and Exclusion of Liability

A. Neither AAA, JAMS, nor any arbitrator is a necessary Party in any judicial proceedings relating to proceedings under these Rules,

B. Neither AAA, JAMS, nor any arbitrator shall be liable to any Party for any act or omission in connection with any proceedings within the scope of these Rules.

C. Any court with jurisdiction over the Parties may compel a Party to proceed under these Rules at any place and may enforce any award made.

D. Parties to these Rules shall be deemed to have consented that judgment upon the award of the arbitrator may be entered and enforced in any federal or state court having jurisdiction of the Parties.

E. Initiation of, participation in, or removal of a legal proceeding shall not constitute waiver of the right to proceed under these Rules.

F. Any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met pending the institution of proceedings under these Rules.

373



### 32. Fees and Expenses

A.  The expenses of witnesses shall be borne by the Party producing such witnesses, except as otherwise provided by law or in the award of the arbitrator.

B.  All attorneys' fees shall be borne by the Party incurring them except as otherwise provided by law, by the Program, or in the award of the arbitrator.

C.  Discovery costs (e.g., court reporter fees for original transcripts) shall be borne by the Party initiating the discovery. The cost of copies of deposition transcripts or other discovery shall be borne by the Party ordering the copy.

D.  The fees and expenses of experts, consultants and others retained or consulted by a Party shall be borne by the Party utilizing those services.

E.  The Employee or Applicant shall pay a $150 fee if he or she initiates arbitration or mediation. Otherwise, Employee/Applicant Parties shall not be responsible for payment of fees and expenses of proceedings under these Rules, including required travel of an arbitrator or a mediator, expenses of an arbitrator, mediator, AAA or JAMS, and the cost of any proof produced at the discretion of an arbitrator.

F.  If the demand for mediation or arbitration is initiated by the Company, such fees will be paid by the Company.

G.  Except as otherwise provided by law or in the award of the arbitrator, all other expenses, fees and costs of proceedings under these Rules shall be borne equally by the Parties who are not Employees/Applicants.

### 33. Interpretation and Application of These Rules

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. All other rules shall be in interpreted and applied by the AAA or JAMS.

### 34. Applicable Law

A.  Proceedings under these Rules and any judicial review of awards shall be governed by the Act.

B.  Except where otherwise expressly provided in these Rules, the substantive law applied shall be state or federal substantive law which would be applied by a United States District Court sitting at the place of the proceeding.

### 35. Mediation

At any time before the proceeding is closed, the Parties may agree to mediate their dispute by notifying AAA or JAMS. AAA or JAMS shall determine what procedures apply to any such mediation.

374

 
## 36. Spanish

A copy of this Program is available in Spanish.

375

# PROGRAMA DE RESOLUCIÓN DE
# CONFLICTOS DE NABORS



*Copies of this pamphlet are available in Spanish, upon request, from any Nabors subsidiary's Human Resources Department.*

*Copias de este folleto estan disponible en español con solo requerirlas al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors*

3'76



EXHIBIT

A#. "B"

## PROGRAMA DE RESOLUCION DE CONFLICTOS DE NABORS

1. 1. Propósito y Diseño

El Programa está diseñado con el fin de proporcionar un medio para la resolución rápida, justa, accesible y económica de conflictos entre la Compañía y los Empleados actuales y anteriores de la Compañía y los Aspirantes para puestos de empleo, con respecto a o como consecuencia de una relación de empleo actual, anterior o potencial con la Compañía. El Programa está diseñado para facilitar un proceso para la resolución definitiva de todas los Conflictos descriptos en los términos del mismo. No está diseñada para limitar o aumentar los derechos fundamentales disponibles bajo las leyes aplicables. El Programa modifica en forma contractual la relación de empleo efectuado entre la Compañía y sus Empleados, pero sólo en la medida en que esté expresamente establecido en el Programa. El Programa deberá ser interpretado de acuerdo con esta intención.

2. Definiciones

A. "AAA" significará la Asociación Americana de Arbitraje (the American Arbritration Association).

B. "JAMS" significará los Servicios de Mediación y Arbitraje Judiciales (Judicial Arbitration and Mediation Services)

C. La "Ley" significará la Ley Federal de Arbitraje (the Federal Arbitration Act)

D. La "Compañía" significará el patrocinador del Programa y las filiales directas o indirectas (ya sean una corporación, una compañía de responsabilidad limitada, una sociedad u otra entidad legal) del patrocinador, la Entidad que Selecciona el Programa, la entidad o persona que se alega tiene responsabilidad asociada o separada con respecto a cualquier Conflicto, y todos sus directores, funcionarios, empleados y agentes, plan de beneficios, ya sea exento o no-exento de impuestos, establecido o mantenido por dicha entidad, los fiduciarios, agentes y empleados de dichos planes, y los sucesores y beneficiarios de dichas entidades, planes y personas; siempre y cuando, en el caso de la Entidad que selecciona el Programa, "La Compañía" deberá incluir la Entidad que Selecciona el Programa solamente en la medida establecida en el contrato de dicha Entidad en la que estará obligada por el Programa.

E. "Conflicto" significará todas las demandas legales y justas, los reclamos y controversias, de cualquier índole o tipo, ya fueren contractuales, o de responsabilidad extracontractual, de acuerdo con el derecho escrito o las regulaciones o alguna otra ley, entre las partes obligadas por el Programa o por un contrato para resolver los Conflictos de acuerdo al Programa, o entre una persona obligada por el Programa y una persona o entidad con derecho a recibir sus beneficios, incluyendo pero sin limitarse a lo siguiente:

1. este Programa;

2. la contratación o la posible recontratación de un Empleado, incluyendo los términos, condiciones o el cese de dicho empleo con la Compañía;

3. los beneficios o incidentes de empleo con la Compañía;

4. todo asunto relacionado con la relación entre el Empleado y la Compañía incluyendo, por ejemplo pero sin limitarse a: la discriminación basada en la raza, el sexo, la religión, el origen nacional, la edad, la condición de veterano de guerra o cualquier incapacidad; el acuso sexual u cualquier otro tipo de acoso; las represalias por concepto de compensación laboral; la difamación, la imposición de un agravio emocional, la reclamación de antimonopolio relacionado con sueldos o el estado de, una reclamación por o una membresía relacionado con los planes de beneficios para empleados;

5. la solicitud de un Aspirante para un puesto de empleo y las acciones y decisiones de la Compañía con respecto a dicha solicitud; y

6. cualquier lesión personal supuestamente incurrida en o alrededor del sitio de trabajo de una Compañía o durante el término y alcance de las actividades laborales de un Empleado.

El "Conflicto" incluye todo lo anteriormente mencionado, independientemente del momento en que hayan ocurrido los eventos en los cuales estén basados, incluyendo los asuntos basados en eventos que hayan sucedido antes de que el Empleado estuviera sujeto a este Programa (siempre y cuando dichos conflictos no fueren establecidos con anterioridad en un tribunal jurídico) o después de la terminación de la relación de empleo.

F. La "Entidad que Selecciona el Programa" significará toda entidad legal que hubiera acordado una obligación por medio el Programa de acuerdo a las disposiciones de este documento.

G. El "Empleado" significará toda persona que estuviera o hubiera sido empleada por la Compañía a la fecha o después de la fecha de vigencia de este Programa, incluso si estuviera o no estuviera empleado por la Compañía en el momento en que una demanda fuera presentada en relación con un Conflicto, y que residiera en los Estados Unidos de América, o que estuviera sujeto a las leyes de los Estados Unidos o de cualquier estado, municipalidad u otra subdivisión política de los Estados Unidos.

H. El "Aspirante" significará toda persona que estuviera buscando o que haya buscado empleo con la Compañía después de la fecha de vigencia de este Programa.

I. Las "Partes" significarán, las personas perjudicadas en relación con un Conflicto particular, y/o las entidades que obligadas y vinculadas por este Programa.

J. El "Programa" significará este Programa de Resolución de Conflictos de Nabors, y como fuere modificado de tiempo en tiempo.

K. Las "Reglas" significarán las Reglas para la Resolución de Conflictos de Nabors, según fueran modificadas de tiempo en tiempo, que sean aplicables a la mediación y el arbitraje.

L. El "Patrocinador" significará Nabors Industries, Inc., una corporación del estado de Delaware.

3. Nombre, Aplicación y Cobertura

A. El Programa será denominado el "Programa de Resolución de Conflictos de Nabors". De forma alternativa, podrá ser referido como el "Programa de Resolución de Conflictos".

B. Hasta que sea revocado por la entidad Patrocinadora de acuerdo con lo dispuesto en este Programa, dicho Programa se aplica y obliga la Compañía, cada Empleado y cada Aspirante y sus herederos, los beneficiarios y los cesionarios de dicha persona o entidad; siempre que este Programa no se aplique a un Empleado que sea parte de un grupo de Empleados representados por una organización laboral o a la

Compañía relacionada con dichos empleados, excepto en la medida permitida en un convenio de negociación colectiva (entre patronos y sindicatos obreros) o legalmente impuesto por la Compañía cuando ningún convenio de negociación colectiva estuviera vigente.

C. Este Programa se aplica a todo Conflicto, salvo se estipule lo contrario en este documento.

D. Sin perjuicio de lo estipulado en este Programa, el mismo no se aplica a las reclamaciones por concepto de indemnización o compensación de beneficios para obreros o de beneficios por concepto de desempleo.

E. La mediación y el arbitraje están solamente disponibles para los Conflictos que involucren derechos que estuvieren protegidos legalmente.

F. Sin perjuicio de otras disposiciones establecidas en este documento, todo tribunal con jurisdicción sobre las Partes puede emitir órdenes judiciales (incluyendo requerimientos judiciales preliminares) si los requerimientos legales y equitativos de acuerdo a las leyes aplicables se cumplieran durante la institución de las demandas bajo el Programa. Adicionalmente, una demanda bajo la Ley denominada The Limitation of Ship Owners Liability Act, 46 U.S.S §§181-189, no estará sujeta a este Programa.

4. **Resolución de Conflictos**

Los conflictos que no fueren resueltos por las Partes serán definitivamente resueltos de acuerdo con este Programa y sus Reglas.

5. **Artículo referente a Represalias**

No se podrá imponer ninguna forma de disciplina, ni se deberá tomar represalias con los empleados por haber iniciado o participado de buena fe en un proceso o una demanda de acuerdo con este Programa.

6. **Enmienda**

A. Este Programa puede ser modificado por el Patrocinador en cualquier momento mediante una notificación previa a los empleados actuales de por lo menos 10 días. Sin embargo, no se deberá aplicar ninguna enmienda a un Conflicto por el cual una demanda haya sido iniciada de acuerdo con las

B. El Patrocinador puede modificar las Reglas en cualquier momento por medio de la notificación de las enmiendas en AAA y JAMS. Sin embargo, ninguna enmienda de las Reglas deberá aplicar a un Conflicto por el cual una demanda haya sido iniciada de acuerdo con las Reglas, salvo se acuerde lo contrario.

7. **Terminación del Programa**

Este Programa podrá ser terminado por el Patrocinador en cualquier momento mediante la notificación a los Empleados actuales en un plazo no mayor de 10 días previo a la terminación antedicha. Sin embargo, la terminación no entrará en vigencia para los Conflictos para los cuales una demanda haya sido iniciada de acuerdo con las Reglas antes de la fecha de terminación, salvo se acuerde lo contrario.

8. **Ley Aplicable**

A. La Ley se aplicará a este Programa, las Reglas y cualquier demanda realizada de acuerdo al Programa o las Reglas, incluyendo las demandas para obligar, hacer cumplir, anular o confirmar demandas, adjudicaciones, órdenes de un árbitro, o resoluciones de acuerdo al Programa o las Reglas.

B. Todos los arbitrajes efectuados de acuerdo con este Programa deberán ser convocados tan cerca como fuera posible del sitio de trabajo donde sucedieron los eventos en disputa, en caso que Nabors continúe realizando labores en esa ubicación. De lo contrario, el arbitraje tomará lugar en el sitio más conveniente para la mayor parte de los testigos.

C. Salvo se establezca de manera expresa en las Reglas contenidas en este documento, se conservan los derechos legales fundamentales, los recursos y los mecanismos de defensa de todas la Partes. En caso de arbitraje, el árbitro tendrá la autoridad para determinar las leyes aplicables y de ordenar las compensaciones legales o equitativas, que una Parte pudiera obtener de un tribunal de jurisdicción competente en base a las reclamaciones presentadas en la demanda.

D. Salvo se estipule de forma expresa en este documento, o en las Reglas del mismo, no se deberá interpretar el Programa con el propósito de otorgar derechos, recursos o mecanismos de defensa fundamentales, legales o contractuales adicionales, los cuales no podrían ser aplicados por un tribunal de una jurisdic-

ción competente en ausencia del Programa.

E. Sin perjuicio de las disposiciones establecidas en la subcláusula anterior, en toda demanda presentada ante un árbitro, el árbitro, a su total discreción, podrá permitir que un Empleado o Aspirante prevaleciente reciba los honorarios para el pago de abogados como parte del fallo dictado. La discreción para permitir la concesión de una asignación de honorarios de acuerdo a esta subcláusula será adicional a toda discreción, derecho o autoridad que el árbitro pudiera tener de acuerdo a las leyes aplicables. Si el árbitro concede los honorarios de abogado sin la autorización para dicha asignación por derecho escrito o contrato, dicha asignación estará limitada a $2,500.00.

9. **Procesos Administrativos**

A. Este Programa se deberá aplicar a un Conflicto que estuviera pendiente ante toda entidad administrativa o tribunal local, estatal o federal, a menos que estuviera prohibido por la ley:

B. La participación en todo proceso administrativo o judicial por la Compañía no deberá afectar la aplicabilidad del Programa a dicho Conflicto una vez que fuere terminado el proceso administrativo o judicial. Un fallo, una recomendación o una decisión efectuada por una entidad administrativa en base a los méritos de un Conflicto deberá tener el mismo peso o efecto legal de acuerdo al Programa como si hubieran sido dictados por un tribunal de una jurisdicción competente.

10. **Recurso Exclusivo**

Los procesos efectuados de acuerdo al Programa deberán ser el método exclusivo, inapelable y vinculante por medio de los cuales se resolverán los Conflictos.

11. **Las Entidades que Seleccionen el Programa**

A. Las Corporaciones u otras entidades legales, que no fuesen Partes del mismo, tienen la opción de decidir si quisieren estar vinculadas y obligadas por este Programa mediante un contrato escrito con el Patrocinador.

B. Dicha opción para participar en este Programa puede ser efectuada en relación con algunos tipos de Conflictos, o en relación con algunas personas, a discreción de la Entidad que Seleccione el Programa.

## 12. La Fecha de Vigencia

La Fecha de Vigencia de este Programa será el 15 de abril de 2001.

## 13. Atribución de Separación

Los términos de este Programa y las Reglas son separables. La falta de validez o de la obligación para que se cumplieran algunas de las disposiciones en este documento no afectará la aplicación de las otras disposiciones. Donde fuere posible, y en forma consistente con los propósitos del Programa, toda disposición que fuera invalidada en el Programa o en las Reglas se podrá modificar y después de modificada, se podrá obligar su cumplimiento.

## 14. Asentimiento

El empleo o la continuación del empleo después de la Fecha en Vigencia de este Programa constituyen el consentimiento por parte del Empleado y la Compañía para estar obligados por las disposiciones de este Programa, durante la duración del empleo y después del cese del mismo. La presentación de una solicitud de empleo, independientemente del formulario utilizado, constituye el consentimiento por parte del Aspirante y la Compañía para estar obligados por las disposiciones de este Programa.

# REGLAS PARA LA RESOLUCIÓN DE CONFLICTOS DE NABORS

## 1. Definiciones

Todas las definiciones incluidas en el Programa de Resolución de Conflictos de Nabors se aplicarán a estas Reglas.

## 2. Aplicación

A. Si hubieran reglas diferentes que fueran aplicables a una determinada clase específica de Conflicto, y éstas hubieran sido adoptadas por el Patrocinador y notificadas a AAA y JAMS, estas Reglas no se aplicarán a dicha clase de Conflictos.

B. Estas Reglas se aplican de la forma en que existieran en el momento en que se iniciaran los procesos establecidos de acuerdo con las mismas.

C. En la medida que fuera consistente con estas Reglas,

las Reglas de Resolución de Conflictos Laborales de AAAo JAMS también se aplicarán a todos los procesos reglamentados por estas Reglas.

3. **El Inicio del Proceso**

A. Una Parte puede iniciar la demanda de acuerdo con lo establecido por estas Reglas en cualquier momento, sujeto a los mecanismos de defensa e incluyendo aquellos que apliquen en el tiempo oportuno de la reclamación, incluyendo las limitaciones y demoras indebidas.

B. Una Parte puede iniciar la demanda mediante la entrega de una solicitud escrita para iniciar la demanda en AAA o JAMS y después del pago de cargo administrativo correspondiente.

C. Las copias de la solicitud deberán ser entregadas a todas las otras Partes del Conflicto por AAAo JAMS. La solicitud deberá describir la índole del Conflicto, el monto involucrado, si lo hubiese, el recurso que se solicita y el sitio solicitado para el proceso.

D. Las demandas también pueden ser iniciadas por un Empleado o Aspirante mediante la entrega de una solicitud escrita para iniciar los procesos al Administrador del Programa de Resolución de Conflictos de la Compañía. En dicho caso, la Compañía deberá entregar en la brevedad posible a AAA o JAMS toda solicitud que hubiera recibido y que hubiera sido entregada en forma apropiada.

E. Las Partes contra quienes se haya presentado una demanda deberán presentar una declaración en respuesta a dicha demanda dentro del plazo de 21 días de la fecha a partir de la que se recibió la notificación de la intención de arbitrar o la descripción de las reclamaciones, la cual deberá incluir las contrademandas y las solicitudes para que el árbitro (si lo hubiera) prepare una declaración fundamentando las razones por las cuales se concede la indemnización.

4. **Junta Administrativa**

AAA o JAMS deberán convocar una junta administrativa tan pronto como sea posible después de haber recibido la declaración de respuesta o después del vencimiento del plazo para la presentación de la declaración de respuesta, si dicha declaración no hubiera sido presentada. La junta puede ser sostenida en persona o por teléfono. En la junta,

384

AAA o JAMS determinarán si las Partes han acordado un método para resolver el Conflicto. Si las Partes estuvieran de acuerdo, AAA o JAMS implementarán el proceso de acuerdo con sus reglas una vez que se haya efectuado el pago del cargo correspondiente. Si las Partes no pueden llegar a un acuerdo, o si las Partes hubieran intentado llegar a un acuerdo y no pudieron resolver el Conflicto por medio de la mediación u otro mecanismo que no fuera vinculante u obligatorio, el Conflicto deberá ser arbitrado de acuerdo con estas Reglas.

5.  **El Nombramiento de un Árbitro**

Inmediatamente después del pago del cargo por concepto de arbitraje, AAA o JAMS deberán enviar simultáneamente a cada Parte involucrada una lista idéntica de los nombres de las personas que fueron escogidas de un panel de árbitros calificados que AAA o JAMS deberá seleccionar y mantener. Cada una de las Partes del Conflicto tendrá catorce (14) días a partir de la fecha del comunicado para tachar los nombres que no prefiere, numerar en orden de preferencia los nombres restantes y devolver la lista a AAA o JAMS. Si una de las Partes no regresara la lista dentro del plazo especificado, todas las personas en la misma serán consideradas como aceptables. Entre las personas que hayan sido aprobadas en ambas listas, y de acuerdo con el orden de preferencia mutua, AAA o JAMS deberán invitar a que uno de ellos o más de uno ejerza/n de árbitro/s. En los casos en los cuales más de $2,000,000 esté en controversia, cualquiera de las partes tendrá el derecho de solicitar que el arbitraje proceda delante de un panel de tres miembros en vez de un solo árbitro. La Parte que escoja un panel en estas circunstancias deberá notificar a las otras Partes durante la junta administrativa descrita en la Cláusula 4 del Programa. Cualquiera de las Partes tendrá el derecho de tachar una lista de árbitros en su totalidad. Cuando una de las Partes ejercita este derecho, AAA o JAMS deberá emitir una nueva lista de árbitros de manera consistente con los procesos anteriormente mencionados.

6.  **Requisitos para la designación de un Árbitro**

Ninguna persona deberá ejercer como árbitro en ningún caso en el cual dicha persona tuviera un interés financiero o personal. Antes de aceptar el nombramiento, el posible candidato deberá revelar cualquier circunstancia que posiblemente pudiera impedir una audiencia oportuna o crear la presunción de parcialidad. Una vez recibida dicha información por parte del árbitro o de cualquier otra fuente, AAA o JAMS tendrá que sustituir esa persona o comu-

nicar la información a las Partes involucradas para que puedan formular sus comentarios. A partir de entonces, AAA o JAMS podrán descalificar dicha persona y su decisión será concluyente.

7. **Vacantes**

Si hubiera una vacante por cualquier razón o si un árbitro designado no pudiera ejercer en forma oportuna, se deberá aplicar el proceso para determinar nombramientos descripto en la Cláusula 5 para la selección de un árbitro substituto.

8. **Fecha, Hora y Sitio para las Audiencias**

A. El árbitro deberá fijar la fecha, hora y sitio de cualquier proceso efectuado de acuerdo con las disposiciones de la Cláusula 8B del Programa.

B. Se proporcionará la notificación de la audiencia con un plazo no mayor de diez (10) días de anticipación, salvo que el árbitro determinara o que las Partes convengan que un período más corto fuera necesario.

C. El árbitro deberá realizar su labor, sin incurrir en gastos indebidos, para acomodar el Empleado o el Aspirante en la selección de un sitio para el proceso.

9. **Juntas**

A pedido de AAA o JAMS, o de una de las Partes o por iniciativa del árbitro, el árbitro de AAA o JAMS podrá convocar a juntas previa notificación para la discusión y la determinación de cualquier asunto que agilice el proceso, incluyendo:

A. la jurisdicción,

B. la aclaración de asuntos de especial interés

C. la determinación de asuntos preliminares, incluyendo el sumario de las consideraciones y disposiciones legales

D. la junta previa a la audiencia

E. el tiempo y sitio para los procesos o juntas de arbitraje

F. los recursos equitativos o legales interinos autorizados por las leyes aplicables

G. los memorandums anteriores o posteriores a la audiencia

H. las disposiciones, y/o

I. cualquier otro asunto o proceso fundamental

10. **La modalidad para realizarAudiencias y Juntas**

A discreción del árbitro o por común acuerdo entre las Partes, se podrán realizar juntas y audiencias por teléfono o por escrito, así como en persona.

11. **La Junta previa a la Audiencia**

A. En un horario que será determinado por el árbitro, cada una de las partes deberá entregar por adelantado los nombres y direcciones de los testigos que se propone presentar y también los documentos que tiene planeado presentar.

B. El árbitro tendrá la discreción para determinar el formato, la cantidad y la frecuencia de las juntas con las Partes involucradas.

C. Las juntas antedichas podrán tomar el formato permitido por las Reglas Federales para Procesos Civiles, ser modificadas de tiempo en tiempo, y estar sujetas a las restricciones impuestas por el árbitro.

12. **Representación**

Cualquiera de las Partes podrá ser representada por un abogado o por cualquier otro representante autorizado.

13. **La Asistencia a las Audiencias**

El árbitro deberá guardar la privacidad de los procesos hasta donde fuera permitido por la ley. Todas aquellas personas que tienen un interés personal en el caso a ser tratado tendrán el derecho de asistir a los procesos de arbitraje.

El árbitro deberá tener la autoridad de excluir a cualquier testigo que no fuera una de las Partes u otra persona esencial, durante del testimonio de otros testigos. El árbitro deberá determinar si alguna otra persona podrá asistir al proceso. A pedido de cualquiera de las Partes, el árbitro deberá excluir cualquier testigo durante el testimonio de otros testigos.

## 14. Aplazamiento de los procesos o juntas de arbitraje

A.  El árbitro, debido a una causa justificada demostrada por una de las Partes, o de común acuerdo con las Partes, podrá postergar cualquier proceso o junta de arbitraje.

B.  La realización de procesos judiciales pendientes y relacionados con el mismo asunto no constituye una causa justificada para su aplazamiento.

## 15. Declaración Jurada

Antes de proseguir con la primera audiencia, cada árbitro podrá tomar el juramento para el ejercicio de su cargo y así lo hará si fuera requerido por la ley. El árbitro puede requerir que los testigos testifiquen bajo juramento conducido por una persona debidamente calificada y así lo hará si fuera requerido por la ley o requerido por alguna de las Partes.

## 16. Registro de los Procesos de Arbitraje

No habrá ningún registro estenográfico, de audio o video de los procesos de arbitraje salvo que fueran solicitados por alguna de las Partes o determinado por el árbitro. La Parte que solicite el registro deberá pagar el costo total de su producción. Se suministrarán copias del registro a pedido de las otras Partes y una vez que se haya pagado el costo de la reproducción.

## 17. Proceso

El Proceso deberá ser dirigido por el árbitro en el orden y de la manera que permita la más rápida presentación de la evidencia y de los argumentos de las Partes.

## 18. El Arbitraje en Ausencia de una de las Partes

El árbitro podrá proseguir en ausencia de una de las Partes o representantes que, después de la debida notificación, no se presentaran o no obtuvieran un aplazamiento. No se alcanzará un fallo solamente en base a la falta de asistencia de una de las Partes. El árbitro deberá requerir que cualquiera de las Partes presentes presente toda la evidencia que el árbitro requiriera con el fin de alcanzar un fallo o conceder una asignación.

388

### 19. Evidencia

A. El árbitro será el único que juzgará la relevancia, la importancia, y la admisibilidad de la evidencia que fuera presentada. La conformidad con las reglas legales referentes a evidencia no será necesaria.

B. El árbitro puede citar con una orden de comparecencia a testigos o documentos a pedido de una de las Partes o por la iniciativa propia del árbitro.

C. El árbitro puede considerar la evidencia de los testigos mediante una declaración jurada o una declaración, pero le deberá dar el peso que el árbitro considere apropiado después de haber considerado cualquier objeción hecha para su admisión al proceso de arbitraje.

### 20. Presentación de la Evidencia después de la Audiencia

La evidencia documentada a ser considerada por el árbitro deberá ser presentada en la audiencia salvo que el árbitro encuentre una justificación para que se permita una presentación posterior a dicha audiencia. Se les deberá proporcionar a todas las Partes la oportunidad para examinar y comentar sobre cualquier evidencia que fuera presentada posteriormente a la audiencia. El árbitro deberá permitir la presentación de expedientes a pedido de una de las Partes y deberá determinar el proceso y el momento oportuno de dicha presentación.

### 21. El Cierre y la Reapertura de los Procesos de Arbitraje

A. Cuando el árbitro esté satisfecho que el registro está completo, incluyendo los expedientes que hayan sido presentados con su permiso después de la audiencia, el árbitro deberá declarar el cierre del proceso.

B. Se podrá reabrir el proceso por iniciativa del árbitro o mediante la solicitud de una de las Partes en cualquier momento anterior al fallo del árbitro.

### 22. Renuncia al Derecho de Objetar en el Proceso de Arbitraje

Después de haber tenido conocimiento de que no se hubiera cumplido con las disposiciones o requerimientos relacionados con estos procesos y reglas de arbitraje, cualquiera de las Partes que no se oponga por escrito será considerada como que hubiera renunciado al derecho de objetar.

## 23. Notificaciones

Cualquier comunicado, notificaciones o procesos necesarios o apropiados para la iniciación o la continuación de cualquier proceso de arbitraje efectuado de acuerdo con estas Reglas (incluyendo el fallo del árbitro, cualquier demanda judicial en relación con el mismo, o la adjudicación de una indemnización efectuada de acuerdo con estos procesos) puede ser enviado por correo dirigido a la Parte o su representante a la dirección más reciente de la cual se tuviera conocimiento o entregado mediante un servicio de mensajería. AAAo JAMS, las Partes, y el árbitro también podrán usar la transmisión por facsímile, telex, telegrama, u cualquier otra forma escrita de comunicación electrónica con el fin de entregar cualquier notificación requerida por esta Reglas.

## 24. La Comunicación con AAA, JAMS y la Compañía

A.  Cualquiera de las Partes podrá notificar o comunicarse con AAA, comunicándose con:

> Regional Administrador
> (Administrador Regional)
> American Arbitration Association
> (Asociación Americana de Arbitraje)
> 1001 Fannin St. Suite 1005
> Houston, Texas 77002
> (713) 739-13022
> Fax: (713) 739-1702

B.  Cualquiera de las Partes podrá notificar o comunicarse con JAMS, comunicándose con:

> JAMS
> 345 Park Avenue, 8th Floor
> New York, NY 10154
> (212) 751-2700
> Fax: (212) 751-4099

C.  Cualquier notificación o comunicado con la Compañía deberá ser dirigido a:

> Legal Department (Departamento Legal)
> Nabors Industries, Inc.
> 515 West Greens Road, Suite 1200
> Houston, Texas 77067-4525
> (281) 874-0035
> Fax: (281) 775-8431

### 25. Comunicación con el Árbitro

No habrá ninguna comunicación con las Partes y el árbitro aparte de la comunicación en las audiencias o juntas de arbitraje. Cualquier otra forma de comunicación ya sea oral o escrita de las partes al árbitro deberán ser dirigidas a AAA o JAMS (y su copia enviada a las Partes) para ser transmitidas al árbitro, salvo que las Partes y el árbitro acuerden lo contrario.

### 26. Plazo para efectuar el Fallo de Arbitraje

El fallo se efectuará rápidamente por el árbitro, salvo que se hubiera acordado lo contrario por las Partes o que estuviera estipulado por las leyes aplicables, en un plazo no mayor de treinta (30) días a partir de la fecha del cierre de los procesos o, si fuera aplicable, del cierre de un proceso de arbitraje que haya sido reabierto.

### 27. El Formato del Fallo de Arbitraje

El fallo del arbitraje deberá ser por escrito y deberá ser firmado por el árbitro. El árbitro deberá redactar una declaración de las razones para el fallo, si fuera requerido en la solicitud para iniciar los procesos o en la declaración de respuesta que se hubieran presentado. El fallo del árbitro deberá ser ejecutado de la manera requerida por las leyes aplicables.

### 28. Modificaciones del Fallo del Árbitro

Como consecuencia de un mandato de un tribunal de jurisdicción competente, o por común acuerdo entre las Partes, el árbitro deberá modificar cualquier fallo que se hubiera dictado. El árbitro podrá modificar un fallo mediante la moción de alguna de las Partes si el árbitro considera que el fallo fuera ambiguo o presentara algún defecto, o si el fallo requiriera un acto ilegal o imposible de realizar. Estas son las únicas circunstancias por medio de las cuales un árbitro tendrá jurisdicción para retirar o modificar un dictamen o fallo.

### 29. Resolución

Si las Partes resuelven su Disputa durante el transcurso del arbitraje, el árbitro podrá describir los términos de la resolución en un fallo de consentimiento.

### 30. Alcance de la Autoridad del Árbitro

La autoridad del árbitro deberá estar limitada a la resolución de Conflictos legales entre las Partes. Como tal, el

391

árbitro deberá estar obligado por y deberá aplicar las leyes aplicables, incluyendo las que estén relacionadas con la determinación del peso de la prueba, así como las leyes fundamentales. El árbitro tendrá la autoridad para limitar o extender los derechos fundamentales protegidos por las leyes aplicables. El árbitro podrá también conceder un recurso de emergencia o provisional que esté o que podría estar autorizado por las leyes aplicables. El árbitro deberá estar obligado a cumplir con las disposiciones del Programa y las Reglas.

31. **Los Procesos Judiciales y la Exclusión de Responsabilidad**

   A. Ni AAA, JAMS o ningún árbitro deberán constituir ninguna de las Partes de ningún proceso judicial en relación con los procesos de arbitraje efectuados de acuerdo con estas Reglas.

   B. Ni AAA, JAMS o ningún árbitro será responsable ante ninguna de las Partes por ningún acto de omisión en relación con cualquier proceso que se encuentre dentro del alcance de estas Reglas.

   C. Cualquier tribunal con jurisdicción sobre las Partes podrá obligar a alguna de las Partes a proceder de acuerdo con estas Reglas en cualquier lugar y podrá hacer cumplir cualquier fallo que se haya dictado.

   D. Se considerará que las Partes bajo estas Reglas consienten en que el fallo del árbitro podrá ser admitido y que dicho fallo se podrá hacer cumplir en cualquier tribunal federal o estatal que tuviera jurisdicción sobre las Partes.

   E. La iniciación de, la participación en, o la eliminación de un proceso legal no constituirá una renuncia al derecho a proceder de acuerdo con estas Reglas.

   F. Cualquier tribunal con jurisdicción sobre las Partes podrá presentar órdenes judiciales (incluyendo órdenes preliminares) si se cumplieran los requisitos legales necesarios y equitativos de acuerdo con las leyes aplicables, en espera de la institución de los procesos de arbitraje efectuados de acuerdo con estas Reglas.

32. **Honorarios y Gastos**

   A. Los gastos de los testigos deberán ser pagados por la Parte que presenta dichos testigos, salvo se indique lo contrario en las leyes aplicables o en el fallo del árbitro.

B. Todos los honorarios de los abogados deberán ser pagados por la Parte que los contrató, salvo se indique lo contrario en las leyes aplicables, en el Programa o en el fallo del árbitro.

C. Los costos de las juntas a realizarse (por ejemplo: los honorarios del relator para la transcripción original) deberán ser pagados por la Parte que inicia la junta. El costo de las copias de la transcripción de la declaración jurada y cualquier otro costo deberá ser pagado por la Parte que solicite la copia.

D. Los honorarios y los gastos de los peritos, asesores y demás que fueren presentados o consultados por una de las Partes, deberán ser pagados por la Parte que utilice dichos servicios.

E. El Empleado o Aspirante deberá pagar un cargo de $150 si él o ella inicia el arbitraje o mediación. Aparte de dicho cargo, el Empleado / Aspirante no será responsable de pagar los honorarios y gastos del proceso efectuado de acuerdo a estas Reglas, incluyendo los viáticos requeridos de un árbitro o mediador, AAA o JAMS, y el costo de cualquier evidencia que fuere presentada a la discreción del árbitro.

F. Si la demanda para mediación o arbitraje es iniciada por la Compañía, dichos honorarios serán pagados por la Compañía.

G. Salvo se indique lo contrario en las leyes vigentes o en el fallo del árbitro, todos los otros gastos, honorarios y costos del proceso efectuado de acuerdo a estas Reglas serán pagados de manera equitativa por las Partes que no son Empleados/Aspirantes.

## 33. Interpretación y Aplicación de Estas Reglas

El árbitro deberá interpretar y aplicar estas Reglas en lo que respecta a los poderes y deberes del árbitro. Todas las otras reglas deberán ser interpretadas y aplicadas por AAA o JAMS.

## 34. Ley Aplicable

A. Los Procesos efectuados de acuerdo a estas Reglas y la revisión judicial de los fallos deberán ser regidos por la Ley.

B. Salvo se indique lo contrario de forma expresa en estas Reglas, las leyes fundamentales aplicadas

deberán ser leyes estatales o leyes federales funda-
mentales que serían aplicadas por un Tribunal de
Distrito de los Estados Unidos que tomara el lugar del
proceso de arbitraje.

## 35. Mediación

En cualquier momento después de que el proceso de arbi-
traje haya concluido, las Partes podrán acordar la
mediación de su disputa por medio de la notificación de
AAAo JAMS. AAAo JAMS deberán determinar que pro-
cesos se aplican a dicha mediación.

## 36. Español

Este Programa de Resolución de Conflictos se encuentra
disponible en inglés y en español

## NABORS DISPUTE RESOLUTION PROGRAM

### NOTICE TO EMPLOYEES

Effective April 15, 2001, Nabors Industries, Inc. and its subsidiaries implemented a Dispute Resolution Program for the determination of all disputes between employees and Nabors Industries, Inc. or one of its subsidiaries. The Program provides the most effective and efficient means of resolving disputes through a process that encourages resolution at the earliest possible opportunity. The Program Administrator is the Vice President Administration of Nabors Industries, Inc.

It is important for you to know that employees do not waive any substantive legal rights under this Program. Rather, the Program provides that any substantive legal issues you may have will be resolved in mediation or before a neutral arbitrator, whose decision will be final and binding on you and the Company. This does mean, however, that under the Program you waive any procedural rights you have to bring a court action and to a jury trial concerning any dispute you may have with the Company and any Electing Entity (as defined in the Program), including claims of discrimination under any federal or state civil rights statute and personal injury claims. Such claims are among those that must be submitted to arbitration under the Program.

A copy of the Program has been provided to all employees. In addition, copies are available in English and Spanish upon request from the Human Resources Department of your employer. Continued employment after the date you receive notice of the Program constitutes your acceptance of the Program.

If you have any questions about the Program or any other term of your employment, please do not hesitate to contact the Human Resources Department of your employer or the Program Administrator.

### PROGRAMA DE RESOLUCIÓN DE CONFLICTOS DE NABORS

#### AVISO A LOS EMPLEADOS

A partir del 15 de abril de 2001, Nabors Industries, Inc. y sus empresas filiales implementaron un Programa de Resolución de Conflictos para la solución de todo conflicto entre los empleados y Nabors Industries, Inc. o una de sus empresas filiales. El Programa le proporciona el medio más efectivo y eficiente para resolver cualquier conflicto que Usted pueda tener a través de un proceso que promueve la resolución del caso en la máxima brevedad posible. El Administrador del programa es el Vicepresidente de la Administración de Nabors Industries, Inc.

Es importante que Usted sepa que los empleados no están renunciando a ningún derecho legal fundamental bajo este Programa, sino que el Programa permite que todo asunto legal substancial que Usted pueda tener sea resuelto por medio de mediación o ante un árbitro neutral, cuya decisión será inapelable y obligatoria para Usted y para la Compañía. Lo anteriormente mencionado significará, sin embargo, que bajo el Programa Usted renuncia a cualquier derecho de procedimiento que Usted pudiera tener para presentar una demanda ante un tribunal o un juicio por jurado respecto a cualquier conflicto que Usted pudiera tener con la Compañía y cualquier Entidad (tal como está definido en el Programa), incluyendo las demandas por concepto de discriminación bajo cualquier derecho civil federal o estatal escrito y los reclamos por concepto de daños y perjuicios personales. Dichos reclamaciones deberán ser sometidos al arbitraje de acuerdo con establecido por el Programa de Resolución de Conflictos.

Se ha proporcionado una copia del Programa a todos los empleados. Además, puede solicitar copias del Programa en inglés y en español en el Departamento de Recursos Humanos de su compañía. El hecho que Usted continúe empleado después de la fecha en que recibió el aviso del Programa constituirá su aceptación del Programa. Si tuviera preguntas en cuanto al Programa o en relación con cualquier otra condición de su empleo, por favor comuníquese con el Departamento de Recursos Humanos de su compañía o el Administrador del Programa.

397


EXHIBIT

AH. "C"

# NABORS DISPUTE RESOLUTION PROGRAM

## QUESTIONS AND ANSWERS

Q1.  Why does the Company have the Dispute Resolution Program (DRP)?

A1.  Mainly, the Company uses the DRP because it provides a cost-effective and timely process for maintaining employment relationships. This process is good for employees and the Company. The more traditional approach of a lawsuit is expensive, time consuming, adversarial and destructive. Typically, lawsuits take years to run their course, and they may create unwanted publicity that embarrasses everyone. The DRP saves everyone time and money, and is more likely to respect everyone's privacy.

Q2.  Who uses the DRP and for what kinds of problems?

A2.  Field personnel, clerical workers, professionals, toolpushers, floorhands, and senior executives alike may use the DRP. The Program is designed for use by employees at every level of the Company, for almost any workplace-related legal dispute, including termination, retaliation for raising a concern or complaint, disciplinary or supervisory issues, discrimination, racial or sexual harassment, or personal injuries.

Q3.  Does having this Program mean I can't sue Nabors in court?

A3.  Yes. If you're covered by the Program and you file a lawsuit, Nabors attorneys will go before the judge, tell the judge of the Nabors Dispute Resolution Program, and the case will be sent to arbitration.

Q4.  What if my dispute concerns a benefit plan? Can I use the Program then?

A4.  You can use the DRP for concerns about benefit plans. However, there are methods in place within each benefit plan to address your concerns, and you should use those methods prior to using the DRP.

Q5.  Will I still be able to go to the Equal Employment Opportunity Commissions (EEOC) of the National Labor Relations Board?

A5.  *Yes.* You are still free to consult the appropriate state Human Rights Commission, the EEOC, the National Labor Relations Board or any other government regulatory agency regarding your workplace problem.

Q6..  What can I do to seek relief if I believe my legally protected rights have been violated?

398



EXHIBIT

Att. 'D''

A6.     If you believe your legally protected rights have been violated, you may serve a written request to the Company's Dispute Resolution Program's Administrator or to The American Arbitration Association (AAA) or the Judicial Arbitration and Mediation Services (JAMS). The arbitrator will determine if a legally protected right has been violated, and if so, the amount you'll recover.

Q7.     Who is the Dispute Resolution Program Administrator?

A7.     The Vice President-Administration of Nabors Industries, Inc..

Q8.     Nabors has some employees in organized bargaining units. Does the DRP apply to them?

A8.     The DRP doesn't automatically apply to unionized employees; they're covered by dispute resolution or grievance procedures agreed to during the collective bargaining process.

Q9.     Why has Nabors implemented the DRP in every newly acquired company?

A9.     We want a program that operates for the benefit of all – the employees and the Company. We want a program that reflects best practices in dispute resolution as well as the needs of our employees.

Q10.    What are Electing Entities?

A10.    For the most part, Electing Entities are customers of Nabors who, through their contracts with Nabors, elect to be bound by the DRP for any legal disputes they may have with Nabors employees.

Q11.    Where will proceedings under the DRP take place?

A11.    Under the DRP, arbitration proceedings are to be held as close as possible to the worksite where the events in dispute occurred or at the place most convenient for a majority of the witnesses.

Q12.    How does the DRP interface with existing complaint procedures, such as the one in place under the Equal Employment and sexual harassment policies?

A12.    The DRP is in addition to those complaint procedures. Your complaint should first be made through existing procedures. If your complaint is not resolved to your satisfaction through those procedures and involves a legally protected right, you should then submit it to the DRP.

dispute_resolution_quest-answer.DOC

399

# PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

## PREGUNTAS Y REPUESTAS

P1. ¿Por qué la Compañía tiene el Programa de Resolución de Disputas (PRD)?

R1. La Compañía utiliza el programa PRD, principalmente, porque éste provee un proceso efectivo en costos y tiempo para mantener la relación con los empleados. Este proceso es bueno para los empleados y para la Compañía. La vía más tradicional de una controversia judicial es costosa, lleva tiempo, crea adversarios y es destructiva. Por lo general, los litigios judiciales llevan años para resolverse y pueden crear publicidad no deseada que avergüenza a todos los involucrados. El PRD le ahorra a todos dinero y tiempo y hay mayores probabilidades que de que se respete la privacidad de todos.

P2. ¿Quiénes usan el PRD y para qué tipo de problemas?

R2. El personal de campo, los trabajadores de la oficina, los profesionales, los jefes de taladros, los ayudantes de limpieza y los ejecutivos mayores, todos pueden usar PRD de la misma manera. El programa está diseñado para ser usado por todos los empleado a todos los niveles de la Compañía, para casi todas las disputas legales relacionadas con el sitio de trabajo, incluyendo terminación, represalia por dar a conocer una preocupación o una queja, asuntos de supervisión o de disciplina, discriminación, hostigamiento racial o sexual o accidentes personales.

P3. ¿Teniendo este Programa significa que no puedo llevar a Nabors a corte?

R3. Sí. Si Ud. está amparado por el Programa y Ud. demanda a Nabors, los abogados de la Compañía se presentarán al juez y le explicarán al juez el Programa de Resolución de Disputas de Nabors y el caso será pasado a arbitraje.

P4. ¿Qué pasa si la disputa es por un plan de beneficio? ¿Puedo usar todavía el Programa?

R4. Ud. puede usar el PRD para asuntos relacionados con los planes de beneficios. Sin embargo, existen métodos establecidos dentro de cada uno de los planes de beneficios que enfocan sus preocupaciones y Ud. debe usar esos métodos primero, antes de usar el Programa.

P5. ¿Tendré todavía la oportunidad de ir a las Comisiones de Igualdad de Oportunidad de Empleo (EEOC) de la Junta Nacional de Relaciones Laborales?

R5. *Sí.* Ud. tiene todavía la libertad para consultar a la Comisión de Derechos Humanos apropiada de su estado, la EEOC, la Junta Nacional de Relaciones Laborales o cualquier otra agencia reguladora gubernamental con relación a su problema en el sitio de trabajo.

400

- 1 -



EXHIBIT
AH. 'E'

P6.   ¿Qué puedo hacer para solicitar ayuda si creo se han violado mis derechos legales de protección?

R6.   Si Ud. considera que se han violado sus derechos legales de protección, Ud. puede someter una requisición por escrito al Administrador del Programa de Resolución de Disputas de la Compañía o a la Asociación de Arbitraje Americana (AAA) o a los Servicios Judiciales de Administración y Mediación (JAMS). El arbitro determinará si sus derechos legales protegidos han sido violados y si es así, la cantidad que Ud. recibirá.

P7.   ¿Quién es el Administrador del Programa de Resolución de Disputas?

R7.   El Vicepresidente de Administración de Nabors Industries, Inc.

P8.   ¿Tiene Nabors empleados en unidades organizadas de sindicatos? ¿ Aplica a ellos el PRD?

R8.   El PRD no aplica automáticamente a empleado sindicalizados; éstos están amparados por procedimientos de resolución de disputas o reclamos acordados durante el proceso de los contratos colectivos.

P9.   ¿Por qué puso Nabors en práctica el PRD en cada una de las compañías nuevas adquiridas?

R9.   Queremos que el Programa opere para el beneficio de todos – tanto de los empleados como de la Compañía. Queremos un programa que refleje las mejores prácticas en la resolución de disputas, así como también las necesidades de nuestros empleados?

P10.  ¿Cuáles son la Entidades de Elección?

R10.  En su mayor parte, las Entidades de Elección son los clientes de Nabors quienes, a través de sus contactos con Nabors, eligen atenerse al PRD para la solución de cualquier disputa legal que puedan tener con los empleados de Nabors.

P11.  ¿Dónde de llevarán a cabo los procedimientos bajo el PRD?

R11.  Bajo el PRD, los procedimientos de arbitraje se llevarán a cabo tan cerca como sea posible del sitio de trabajo donde ocurrieron los eventos en disputa o en el lugar más conveniente para una mayoría de los testigos.

P12.  ¿Cómo se corresponde el PRD con los procedimientos de reclamo existentes, tales como el que existe bajo las políticas de Igualdad de Empleo y de hostigamiento sexual?

R12.  El PRD es una adición a esos procedimientos de reclamo. Su queja se debe canalizar primero a través de los procedimientos existentes. Si su queja no se resuelve a su satisfacción a través de estos procedimientos e involucra un derecho protegido legalmente, entonces Ud. debe someterla al PRD.

dispute_resolution_quest-answer-span.doc

401



**17 de enero de 2007**

**A:**     Todos los Empleados de Nabors Industries, Inc. y Subsidiarias

**REF:**  Programa de Resolución de Disputa de Nabors

Estimado Empleado:

A partir de diez (10) días después de la fecha de este aviso, de conformidad con la Sección 6 del Programa de Resolución de Disputa de Nabors de Nabors Industries, Inc. ("Nabors") y sus subsidiarias están enmendando el Programa y Reglamentos de Resolución de Disputa de Nabors para la determinación de todas las disputas entre los empleados y Nabors o una de sus subsidiarias.

Las enmiendas al Programa y Reglamentos están anexas en la parte posterior de esta página. Nabors estás enmendando una (1) sección del Programa de Resolución de Disputa de Nabors y una (1) sección de los Reglamentos de Resolución de Disputa de Nabors. Usted debe ya tener una copia del programa y los reglamentos actuales o pueden encontrarse en la Intranet de Nabors, de acuerdo a la política número 200.80.1, en http://sharepoint.nabors.com/C10/Human%20Resources/default.aspx.

Como antes, el Programa de Resolución de Disputa de Nabors, incluyendo sus enmiendas, le da los medios más efectivos y eficientes para resolver cualquier disputa que pueda tener, a través del proceso que estimula la resolución a la oportunidad más inmediata. Los empleados no renuncian a algún derecho legal sustantivo de acuerdo al Programa. En su lugar, el programa, incluyendo sus enmiendas, estipula que cualquier asunto legal sustantivo que pueda tener, sea resuelto sobre una base individual por mediación o ante un árbitro neutral, cuya decisión será final y que lo obliga a usted y a la Compañía. De acuerdo al programa. incluyendo sus enmiendas, sin embargo, usted renuncia a todo derecho de procedimiento que pueda tener para iniciar una acción judicial en base individual, colectiva, de clase o representativa; y usted renuncia al derecho de un juicio ante jurado en relación con alguna disputa que pueda tener con la Compañía o alguna Entidad Electora (como es definida en el Programa), que incluye alguna reclamación de lesión o reclamación de discriminación en base a raza, origen nacional, género, religión, edad o discapacidad ,de acuerdo con cualquier estatuto de derechos civiles federales o estatales.

Cada individuo que trabaja para Nabors Industries, Inc. o una subsidiaria está sujeto al Programa, incluyendo sus enmiendas, excepto que las disposiciones enmendadas afecten solamente a las disputas iniciadas después de la fecha efectiva de la enmiendas y sin asuntos pendientes antes de la fecha efectiva. Su empleo continuado después de la fecha en que reciba este aviso constituirá su aceptación de las enmiendas al Programa, tanto durante y después de su empleo con la Compañía.

Esperamos continuar trabajando juntos. Si tiene alguna pregunta acerca de estas enmiendas al Programa y a los Reglamentos o a cualquier otro término de su empleo, por favor, no dude en comunicarse con el Departamento de Recursos Humanos de su empleador.

Atentamente,

NABORS INDUSTRIES, INC.

*\*Una copia de este aviso está disponible en español,*
*si la solicita al Departamento de Recursos Humanos de cualquier subsidiaria de Nabors.*

402



## Enmienda al PROGRAMA DE RESOLUCIÓN DE DISPUTA DE NABORS:

4. **Resolución de disputas**

   A. Todas las disputas que no sean de otro modo establecidas por las Partes serán finales y resueltas de manera concluyente, de acuerdo a este Programa y a los Reglamentos. Las partes renuncian a todo derecho que puedan tener a un juicio ante jurado sobre reclamaciones relacionadas de alguna manera a cualquier disputa.

   B. Cada disputa será arbitrada sobre una base individual. Las Partes preceden y renuncian a cualquier derecho para unirse o consolidar reclamaciones en arbitraje cono otros o para hacer reclamaciones al arbitraje como un representante o como un miembro de una clase o en capacidad de abogado particular o similar, a menos que tales procedimientos sean convenidos por todas las partes. Ni la Compañía ni algún Empleado o Solicitante puede continuar alguna Disputa sobre una base de acción de clase, de acción colectiva o consolidada o en capacidad de representación de otras personas o entidades que hayan reclamado estar situados similarmente o participado como un miembro de clase en tal demanda. El árbitro en alguna demanda de acuerdo a este Programa no tendrá autoridad para conducir el asunto como una acción consolidada, de clase colectiva o de representación.

   C. Si la limitación del procedimiento en el Párrafo B de esta Sección no puede hacerse cumplir por un tribunal en una demanda en la cual una parte busca ejercer una acción consolidada, de clase o colectiva, o actuar de otra manera en una capacidad de representación, entonces este programa aplicará a tal demanda sólo al siguiente alcance. El tribunal decidirá si la Disputa debe proceder sobre una base consolidada, de clase, colectiva u otra de representación y, si es así, definirá el alcance de la clase. Ninguna de las determinaciones anteriores será remitida al árbitro y en ningún caso el árbitro tendrá el poder para determinar la certificación de acción de clase, colectiva o de representación. Las decisiones del tribunal estarán sujetas a apelación en conformidad a las reglas de procedimiento aplicables. Si el tribunal certifica una acción de clase, colectiva u otra representación, entonces todas las otras determinaciones, dentro o relacionadas con la Disputa, serán hechas por el árbitro. El árbitro determinará las preguntas de responsabilidad para, o de la clase, como un todo y los remedios disponibles para o de la clase, como un todo. En árbitro también decidirá el desagravio, si lo hay, al cual una parte o miembro de clase puede tener derecho individualmente. Si el tribunal, no obstante, niega en última instancia una solicitud de una parte para proceder sobre una base consolidada, de clase, colectiva o de representación, entonces esa reclamación individual de la parte estará todavía sujeta a este Programa y referible al arbitraje en conformidad a sus términos.

## Enmienda a los REGLAMENTOS DE RESOLUCIÓN DE DISPUTA DE NABORS:

30. **Alcance de la Autoridad del Árbitro**

    A. La autoridad del árbitro será limitada a la resolución de Disputas legales entre las Partes. Como tal, el árbitro estará obligado y aplicará la ley pertinente, que incluye aquello relacionado con la ubicación de la carga de la prueba, así como la ley sustantiva. El árbitro no tendrá la autoridad, ya sea de abreviar o aumentar, los derechos sustantivos disponibles de acuerdo con la ley aplicable. El árbitro también puede otorgar desagravio de emergencia o temporal que sea o sería autorizado por la ley aplicable. El árbitro estará obligado y cumplirá con las disposiciones del Programa y los Reglamentos.

    B. El árbitro no tendrá el poder de escuchar reclamaciones en el arbitraje como una acción de clase o colectiva, o en capacidad de abogado particular o similar o sobre otra base de capacidad de representación, o ausente el consentimiento de todas las partes, sobre una base consolidada. El árbitro estará autorizado a decidir solamente las reclamaciones disputadas entre las partes individuales.

403



# APPLICATION FOR
# HOURLY AND DAILY EMPLOYMENT



**Applicant Must Read And Verify With Signature**

I declare that the statements contained in this application are correct and understand that withholding information or making a false statement in this application and information submitted therewith or at any time during the application and pre-employment process will be the basis for my application not to be considered and/or dismissal. I authorize all employers, educators and other firms or person named herein to provide the Company with information regarding my education, employment and medical history and release all such individuals or entities from all liability for any damages that may result from furnishing information regarding me.
_____VA_____ - INITIALS

I understand that this application does not obligate the company to offer me employment or to hire me. I further understand that if I am employed by the Company, my employment will be on an "at will" basis and may be terminated by the Company at any time with or without cause or notice. If I am employed I understand that I will wear the prescribed personal protective equipment and will abide by all Federal, State and Company procedures and regulations while working for the Company. _____VA_____ - INITIALS

I acknowledge that a copy of the Company's Dispute Resolution Program was available for my review at the location where I submitted this application. I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirements for submission of all claims to a process that may include mediation and/or arbitration and that if I refuse to sign below that my application will not be considered for employment. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.
_____VA_____ - INITIALS

If I am hired, I hereby agree to participate in the Company's Payroll Direct Deposit System for payment of salaried employees and complete the Payroll Direct Deposit Authorization for me to implement the Payroll Direct Deposit System for my pay. _____VA_____ - INITIALS

This application will be considered active for thirty (30) days.

_____   06-21-09
Applicant's Signature                              Date

**Applicants for Positions that require a Commercial Drivers license must also complete "An Employment Application Supplement for Positions Requiring a Commercial Drivers License (CDL).**

Page 3 of 3



**EXHIBIT**
Att. "G"

404

## EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

_Victor Aviles Lopez_
Name of Employee (Print)

_Signature of Employee_

_06-22-07_
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un periodo de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales.

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje. Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

_Victor E. Aviles Lopez_
Nombre del Empleado (Letra de Imprenta/Molde)

_Firma del Empleado_

_06-22-07_
Fecha

[RETAIN IN EMPLOYEE SERVICE FILE]

[ESTE FORMULARIO DEBERÁ SER COLOCADO EN EL ARCHIVO DEL EMPLEADO]

405

## NOTICE TO APPLICANTS REGARDING
## DISPUTE RESOLUTION PROGRAM

Nabors Industries, Inc. and its subsidiaries have a Dispute Resolution Program in effect to handle all disputes between applicants or employees and the Company. This program gives applicants and employees the most effective and efficient means of resolving any disputes they may have through a process that encourages a resolution at the earliest possible opportunity.

A copy of the Dispute Resolution Program is being provided for your review. If any applicant fails to acknowledge and agree to the Program, they will not be considered for employment. The acknowledgement is provided below for your signature.

1.  I have been allowed the opportunity to review the Nabors Dispute Resolution Program.

2.  By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to a process that may include mediation and/or arbitration. I further understand that my employment application submission with the Company constitutes my acceptance of the terms of this provision as a condition of employment consideration.

_Victor Humes_
Name of Applicant

_4-18-6_
Date

_[signature]_
Signature of Applicant


## AVISO PARA ASPIRANTES DE EMPLEO RESPECTO AL PROGRAMA DE RESOLUCIÓN
## DE CONFLICTOS

Nabors Industries, Inc. y sus filiales tienen un Programa de Resolución de Conflictos vigente para tratar todas los conflictos entre aspirantes o empleados y la Compañía. Este programa le proporciona a aspirantes y empleados el medio más efectivo y eficiente para resolver cualquier conflicto que pudieran tener a través de un proceso que fomenta una resolución de la misma a la máxima brevedad posible.

Junto con el presente aviso se le está proporcionando una del Programa de Resolución de Conflictos para su revisión. Si un aspirante a un puesto de trabajo no acusa recibo y no está de acuerdo con el Programa, no será considerado para el empleo. Se le proporciona este formulario de acuso de recibo de esta notificación con respecto al programa de resolución de conflictos para que usted lo firme en conformidad a continuación.

3.  Se me ha permitido revisar el Programa de Resolución de Conflictos de Nabors.

4.  Con mi firma a continuación, acuso recibo de la información anteriormente mencionada y comprendo que se me requiere cumplir con el Programa de Resolución de Conflictos y su requisito de someter todos los reclamos a un proceso que puede incluir mediación y/o arbitraje. También comprendo que la presentación de mi solicitud para empleo con la Compañía constituye mi aceptación de los términos de esta disposición como una condición para ser considerado para el empleo.

Nombre del Aspirante

Firma del Aspirante

Fecha

406

## EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

_Victor Nates_  
Name of Employee (Print)

_[signature]_  
Signature of Employee

_04-29-06_  
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un periodo de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales.

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje. Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

_____  
Nombre del Empleado (Letra de Imprenta/Molde)

_____  
Firma del Empleado

_____  
Fecha

[RETAIN IN EMPLOYEE SERVICE FILE]

[ESTE FORMULARIO DEBERÁ SER COLOCADO EN EL ARCHIVO DEL EMPLEADO]

407

## EMPLOYEE ACKNOWLEDGEMENT
## CONCERNING NABORS DISPUTE RESOLUTION PROGRAM

I have received a copy of the Nabors Dispute Resolution Program.

I acknowledge that the Employee Dispute Resolution Program is not a contract of employment between the Company and me for any specific time period and does not alter the employment-at-will relationship. The employment relationship between the Company and all employees is based on mutual consent and can be terminated at any time, either by myself or the Company, without notice or requirement of cause.

I understand that nothing contained in the Employee Dispute Resolution Program is intended to violate or restrict any rights of employees guaranteed by state or federal laws.

By my signature below, I acknowledge and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to a process that may include mediation and/or arbitration. I further understand that my employment or continued employment with the Company constitutes my acceptance of the terms of this provision as a condition of my employment or continued employment.

_____        _____
Name of Employee (Print)                Signature of Employee


_____
Date

## FORMULARIO ACUSANDO RECIBO POR PARTE DEL EMPLEADO
## DEL TEXTO DEL
## PROGRAMA DE RESOLUCIÓN DE DISPUTAS DE NABORS

Por la presente declaro que he recibido una copia del texto del Programa de Resolución de Disputas de Nabors.

Yo entiendo que el Programa de Resolución de Disputas de Nabors no representa un contrato de empleo entre la Compañía y mi persona por un periodo de tiempo específico y no modifica la relación de empleo a voluntad. La relación de empleo entre la Compañía y todos los empleados está basada en un consentimiento mutuo y puede quedar cesante en cualquier momento, ya sea por mi parte o por parte de la Compañía, sin aviso previo o presentación de causa.

Yo comprendo que ninguna parte del contenido del Programa de Resolución de Disputas tiene la intención expresa de violar o limitar los derechos de los empleados garantizados por el estado o las leyes federales.

Con mi firma reconozco y entiendo que se requiere que yo cumpla con el Programa de Resolución de Disputas y el requisito de someter cualquier disputa a un proceso que pudiera incluir la mediación y/o el arbitraje. Adicionalmente, comprendo que mi empleo presente o futuro con la Compañía representa mi reconocimiento expreso de los términos de esta disposición como condición de mi empleo presente o futuro.

_____        _____
Victor Aviles
Nombre del Empleado (Letra de Imprenta/Molde)    Firma del Empleado

_____
8-1-07
Fecha

[RETAIN IN EMPLOYEE SERVICE FILE]

[ESTE FORMULARIO DEBERÁ SER COLOCADO EN EL ARCHIVO DEL EMPLEADO]

408



# NABORS
# WELL SERVICES LTD.

## MEMO

**TO:** Laura Doerre        **DATE:** August 21, 2007

**FROM:** Roy D. Cole

**SUBJECT:** Customer – Buffco Production Inc. - Rig 721

---

Laura,

New information from the field indicates that we have not moved to the Timberlake #5 well for Buffco Production Inc. of which a copy of the IADC Daywork Drilling Contract was previously delivered to you this morning.

Please find enclosed the current IADC Daywork Drilling Contract between Nabors Well Services Ltd. and Buffco Production Inc. utilizing Rig 721 which was in effect on August 20, 2007.

Should you require further information, please advise.

Thanks,


Roy
/attachments

Memo form to Laura Doerre re Buffco Production_Rig 721_821-2007.doc

409

EXHIBIT

2


FILE



... Well Partners Ltd." may delay work using Rig #21 on the last well ... June 15, 2007 completion is linked, for a period of time needed to complete a ... of the job for Nabors' other customer. Nabors will return to perform work on the ... which will continue to be governed by the current 4 well IADC previously referenced.

AGREED TO AND ACKNOWLEDGED THIS ___6___ DAY OF JUNE, 2007

BUFFCO PRODUCTION INC.

(signature)



**NABORS**
**WELL SERVICES LTD.**

515 West Greens Road
Suite 1170
Houston, Texas 77067-4525

Phone: 281.874.0035
Fax: 281.775.4855
www.nabors.com

May 10, 2007


BUFFCO PRODUCTION, INC.
P.O. Box 2243
Longview, Texas 75606

Attention: Mr. Frank Bufkin

RE:  Nabors Rig #721
     Bowen #6 Well
     IADC Daywork Drilling Contract – US, dated April 13, 2007 ("Original Contract")
     Panola County, Texas


Dear Mr. Bufkin:

This letter agreement when executed by you shall constitute an Agreement entered into by and between Buffco Production, Inc. ("Buffco") and Nabors Well Services Ltd., ("Nabors") collectively referred to herein as the ("Parties"), regarding the provision of drilling and other well services by Nabors to Buffco, for the Bowen #6 well and 3 additional wells in Panola County, Texas as set forth below.

In consideration of the mutual promises, conditions and agreements herein contained, the sufficiency of which is hereby acknowledged, the parties mutually agree as follows:

> The Parties hereby agree that the terms and conditions contained in Original Contract will apply to all activities connected with services provided by Nabors on the Brown #3 well drilled or serviced using Nabors Rig #721.

The Parties hereby agree to further amend the Original Contract as follows:


ADD Paragraph 27.9    Location of the third well is the Brown #3 in Panola County, Texas. Upon Completion of the current well, the Brown #2 in Panola County, Texas, per Paragraph 27.5, the Operating Day Rate for the Brown #3 well will increase to $17,500.00 per day with or without drill pipe or using Operator's drill pipe; Mobilization and Moving fee of $38,000.00 will be charged to the Operator, Standby and Demobilization fee of $16,000.00 per day will be charged to the Operator.

Except as modified herein, all other rates, terms and conditions of the Original Contract remain unchanged and in full force and effect.

411

Buffco Production, Inc. – Rig 721
Page 2 of 2

Please confirm your acceptance of the foregoing by signing below. Please retain one copy and return the other to the attention of Roy Cole, Director – Contracts Administration at the address on this letterhead. Should you have any questions, you may contact Roy Cole at (281) 775.5128.

Sincerely,
Nabors Well Services Ltd.
By its General Partner Nabors Well Services Co.

Nicholas Petronio
President

AGREED AND ACCEPTED this _17th_ day of _May_, 2007.
BUFFCO PRODUCTION INC.

By: _____

Title: _____

Buffco Production, Inc._R721_Bowen #7_LA_v1_05-08-2007

412

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties, and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.

Revised April, 2003



INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS
**DRILLING BID PROPOSAL**
**AND**
**DAYWORK DRILLING CONTRACT - U.S.**

TO: _____

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____
this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M. on _____, 20 **07** ,
to the following address: _____

**THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY,**
**RELEASE OF LIABILITY, AND ALLOCATION OF RISK—**
**SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14**

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

| | |
|---|---|
| OPERATOR: | Belliw Production, Inc. |
| Address: | P.O. Box 2343 Attn: Frank Belkin |
| | Longview, Texas 75606 |
| CONTRACTOR: | Nabors Well Services Ltd. |
| Address: | 515 West Greens Road Suite 1170 Attn: Mr. Roy D. Cole |
| | Houston, Texas 77067-4526 |

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.

**1. LOCATION OF WELL:**

Well Name and Number: **Bowen # 6**

Parish/County: **Panola County**     State: **Texas**     Field Name: **Beckville**

Well location and land description: **All locations related to the performance of services by Nabors Rig # 721 as advised by Operator during the term of this contract unless such services are covered by a separate executed written agreement.**

1.1 Additional Well Locations or Areas: **5 additional wells in East Texas. All locations related to the performance of services by Nabors Rig # 721 as advised by Operator during the term of this contract unless such services are covered by a separate executed written agreement.**

Licenses described above are for tax and contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

**2. COMMENCEMENT DATE:**

Contractor agrees to use reasonable efforts to commence operations for the drilling of the well by the **15th** day of **April**, 20 **07** , or a date mutually agreed to by Operator and Contractor. Contractor shall not be bound by the rates contained herein if Operator does not provide a sound location to accept Contractor's rig by April 14, 2007.

**3. DEPTH:**

3.1 Well Depth: The well(s) shall be drilled to a depth of approximately **10,500** feet, or to the **Cotton Valley** formation, whichever is deeper, but the Contractor shall not be required hereunder to drill said well(s) below a maximum depth of ** _____ feet, unless Contractor and Operator mutually agree to drill to a greater depth. ** Not to exceed capacity of rig as described on the rig inventory attached hereto.

**4. DAYWORK RATES:     ALSO SEE PARAGRAPH 27.5**

Contractor shall be paid at the following rates for the work performed hereunder.

4.1 Mobilization: Operator shall pay Contractor a mobilization fee of $ **36,500.00*** or a mobilization day rate of $ _____ per day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include: rig time while moving to and rigging up on the new well site. *Plus actual costs of trucks, cranes, man-lifts, permits and string up services which will be contracted directly by Operator and billed directly to Operator by the provider of such services. *Also see Paragraph 27.4.

4.2 Demobilization: Operator shall pay Contractor a demobilization fee of $ **15,500.00*** or a demobilization day rate during tear-down of $ _____ per-day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include: commence after mud tanks are cleaned and include rig time while rigging down and removing rig from the final well locations, and rig time while moving the rig to the nearest stack out location. *Plus actual costs of trucks, cranes, man-lifts, permits and string down services which will be contracted directly by Operator and billed directly to Operator by the provider of such services.

4.3 Moving Rate: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on **N/A**, Operator shall pay per-twenty-four-(24)-hour-day* Plus actual costs of trucks, cranes, man-lifts, permits and string down services. Contractor a sum of $ **36,500.00*** ALSO SEE PARAGRAPH 27.4 AND 27.5.

4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with **Five (5)** man crew the operating day rate shall be:

| Depth Intervals | | Without Drill Pipe | With Drill Pipe |
|---|---|---|---|
| From | To | | |
| | | $ **17,000.00*** per day | $ **N/A** per day |
| | | $ _____ per day | $ _____ per day |
| | | $ _____ per day | $ _____ per day |

Using Operator's drill pipe $ **17,000.00*** per day. ALSO SEE PARAGRAPH 27.5

The rate will begin when the drilling unit is rigged up at the drilling location, or positioned over the location during marine work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.

I.A.D.C. Daywork Contract - Page 62
Copyright © 2003 International Association of Drilling Contractors

Form provided by Forms-On-A-Disc
(214) 340-9429 - FormsOnADisc.com

Revised April, 2003

(b) By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c) By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following three business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 5.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.6 shall apply until payment is made by Operator and operations are resumed. *In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder. *ALSO SEE PARAGRAPH 27.7*

**6.4 Early Termination Compensation:**

(a) Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as liquidated damages and not as a penalty a sum equal to the standby time rate (Subparagraph 4.6) for a period of __Five (5)__ days, at a lump sum of $_____

(b) Prior to Spudding: If such termination occurs after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of drilling or other crew members and supervision directly assigned to the rig; (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operations hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or __but not less than five (5) days at the Operating Day Rate. *ALSO SEE PARAGRAPH 27.7*

(c) Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor; but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for __Five (5)__ days at the applicable rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates; or (2) at the election of Contractor and in lieu of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus a lump sum of $__such__ provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or __NA

**7. CASING PROGRAM**

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

**8. DRILLING METHODS AND PRACTICES:**

8.1 Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2 Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characteristics and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3 Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "D" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4 Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5 If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

**9. INGRESS, EGRESS, AND LOCATION:**

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not reasonably within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or reinforcement of roads, bridges and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with leveling the rig because of location settling.

**10. SOUND LOCATION:**

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must

IADC Daywork Contract - Page 4
Copyright © 2003 International Association of Drilling Contractors

Form provided by Forms-On-Disk
(214) 340-8425 • FormsOnDisk.com

damage to property. Operator's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor, pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitee, or voluntarily self-insured, in part or wholly) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 Liability for Wild Well: Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 Pollution or Contamination: Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, oil emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and fish recovery materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 Consequential Damages: Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 Indemnity Obligations: Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(b), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of each parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15. AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16. NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

17. FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acute and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under the Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Subparagraph 4.8 above.

18. GOVERNING LAW:

This Contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws

**23. ACCEPTANCE OF CONTRACT:**

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9 and 8.3(c), Paragraphs 10 and 13, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Operator this _____ day of _____, 20___.

OPERATOR: _____

By: _____

Title: _____

The foregoing Contract, including the provisions relating to indemnity, release of liability and allocation of risk of Subparagraphs 4.9, 8.3(c), Paragraphs 10 and 13, and Subparagraphs 14.1 through 14.12, is acknowledged, agreed to and accepted by Contractor this _____ day of _____ April _____, 20___, which is the effective date of this Contract, subject to rig availability, and subject to all of its terms and provisions, with the understanding that it will not be binding upon Operator until Operator has noted its acceptance, and with the further understanding that unless said Contract is then executed by Operator within ___ seven (7) ___ days of the above date Contractor shall be in no manner bound by its signature hereto.

CONTRACTOR: _____

By: _____  Nicholas Petronio

Title: President

# REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.

Contractor

| | | | | | | | Weight (lbs/gal) | Viscosity (Sec) | Water Loss (cc) |
|---|---|---|---|---|---|---|---|---|---|
| Surface | 11 | ft. | 16 | ft. | 24 | bbl. | 80 | | |
| Protection | | ft. | 8.82 | ft. | | bbl. | 1,200 | | |
| Production | 7.87 | ft. | 4.5 | ft. | 11 | bbl. | 10,600 | | |
| Liner | | ft. | | ft. | | bbl. | | | |

2. MUD CONTROL PROGRAM (See Subparagraph 8.2)   Furnished by Operator

| Depth Interval (ft) | | | | | Weight (lbs/gal) | Viscosity (Sec) | Water Loss (cc) |
|---|---|---|---|---|---|---|---|
| From | To | Type Mud | | | | | |

Other mud specifications: _____

3. INSURANCE (See Paragraph 10)

3.1 Adequate Workers' Compensation Insurance complying with State Laws applicable or Employers' Liability Insurance with limits of $____ (per occurrence) covering all of Contractor's employees working under this Contract.

3.2 Commercial (or Comprehensive) General Liability Insurance, including contractual obligations as respects this Contract and proper coverage for all other obligations assumed in this Contract. The limit shall be $____ per occurrence, combined single limit per occurrence for Bodily Injury and Property Damage.

3.3 Automobile Public Liability Insurance with limits of $____ for the death or injury of each person and $____ per occurrence, for each accident; and Automobile Public Liability Property Damage Insurance with limits of $____ per accident.

3.4 In the event operations are conducted in state or federal waters, Contractor shall comply with the Jones Act, Workers' Compensation, maritime employment, and Longshoremen and Harbor Workers' Compensation Act and other requirements of such legislation.

3.5 Other Insurance: _____

4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY CONTRACTOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Contractor unless otherwise noted by this Contract.

4.1 Drilling Rig "Subject to rig availability - See Exhibit D Rig Inventory attached hereto and made a part hereof.

Complete string rig, designated by Contractor as its Rig No. ____ Tot ____ the major items of equipment being:

Drawworks: Make and Model _____
Engines: Make, Model, and H.P. _____
No. on Rig _____
Pumps: No. 1 Make, Size, and Power _____
No. 2 Make, Size and Power _____
Mud Mixing Pump: Make, Size, and Power _____
Boiler: Number, Make, H.P. and W.P. _____
Derrick or Mast: Make, Size, and Capacity _____
Substructure: Size and Capacity _____
Rotary Drive Type _____
Drill Pipe: Size _____ in. _____ a: Size _____ in. _____ p
Drill Collars: Number and Size _____

IADC Drilling Contract - Onshore U.S. - Page 20
Copyright © 2003 International Association of Drilling Contractors

4. EQUIPMENT, MATERIALS AND SERVICES TO BE FURNISHED BY OPERATOR:

The machinery, equipment, tools, materials, supplies, instruments, services and labor hereinafter listed, including any transportation required for such items, shall be provided at the well location at the expense of Operator unless otherwise noted by the Contract.

Form provided by Forms On-A-Disk
(714) 545-4425 - FormsOnADisk.com

Copyright © 2000 International Association of Drilling Contractors

Forms provided by Forms On-A-Disk
(214) 340-9429 · FormsOnADisk.com

7. OTHER PROVISIONS:

**THIS PAGE IS INTENTIONALLY LEFT BLANK.**

IADC Drilling Contract - Model A - Page 6
Copyright © 2003 International Association of Drilling Contractors

Form provided by Forms On-A-Disk
(214) 340-9429 - FormsOnADisk.com

**EXHIBIT "B"**

(See Subparagraph 8.3)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

(1)     The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

(2)     The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

(3)     The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

(4)     The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

## THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.

## CONTRACTORS SPECIAL PROVISIONS

1. Contractor shall furnish initial tested annular preventer element. If the element is damaged due to destructive elements introduced to the mud, stripping, or excessive testing, the Operator agrees to furnish a new element.

2. Chemical Additives to the mud for preventing oxidation of the drill string and hydrogen sulfide scavenging chemicals to treat the mud or drilling fluid as necessary to remove all traces of $H_2S$ and to control oxygen corrosion to be furnished by the Operator.

3. Operator shall furnish all labor, equipment and materials to clean rig after use of oil base mud and/or completion fluid.

4. Extra cost to rig up for drilling with oil base mud including, but not limited to, the cost of pit covers, steam cleaners, drip pans, mud vacs and cleaning materials shall be at Operator's expense.

5. Initial inspection of all drill pipe, drill collars, kelly, kelly joints, valves, subs and HWDP shall be at Contractor's expense. All repairs, replacements and hauling for repairs will be at Contractor's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.) Present Pipe has been downgraded to Class II. At any time, should there be failures of existing string and at Operators discretion, a new string of 4 ½" drillpipe will be provided by Contractor. Should the existing Class II drillpipe be downgraded to Class III, lost in hole, or damaged beyond repair, it will be charged to Buffco at $10.00 per / ft.

6. Subsequent inspections (including the inspection at the end of the job), drill collars, kelly, kelly joints, valves, subs and HWDP shall be at the Operator's expense. All repairs, replacements and hauling for repairs will be at Operator's expense. (The inspection will be to T.H. Hill, DS1, Category 3 or its equivalent.)Future inspection of the Class II drillpipe will be at the discretion of the Operator. Should the new string of drillpipe by used, Operator is responsible for all inspections, repairs, trucking charges, etc. Also, at the end of the contract, if new drillpipe has been used, it will be fully inspected and if necessary repaired or replaced at 100% replacement cost. .

7. Operator shall furnish all screens for shale shakers.

8. Operator shall furnish all potable water for Operator and Contractor personnel.

9. Contractor shall agree to furnish, subject to availability and at Operator's request, any necessary 3 ½" drill pipe, 4 ¾" drill collars and all related handling equipment for a mutually agreed rental rate.

10. Operator, Operator's representatives and Operator's sub-contractors shall support Contractor's Safety Policies and Procedures in general and in particular, will comply with all Contractor's personal protective equipment requirements.

11. Operator will be responsible for the provision and maintenance of any site septic systems.

12. Contractor will provide only one size of mud pump liners. Any additional sizes required by Operator will be provided by Operator at Operator's cost.

13. All third party equipment required to nipple up/nipple down BOP equipment will be provided and paid for by Operator.

14. The rates contained in this Contract are based on the rig inventory attached hereto. Any modification or addition to the rig requested by Operator will be at Operator's expense.

15. Operator shall test BOP equipment at intervals as specified in federal, state or local regulations, API Recommended Practice or every twenty-one (21) days whichever interval is more stringent. All testing will be performed by an independent testing company provided and paid for by Operator.

16. In all cases where Contractor's employees (including Contractor's direct, borrowed, special or statutory employees) are covered by the Louisiana Worker's Compensation Act, La. R. S. 23:1021 et seq., Operator and Contractor agree that all work and operations performed by Contractor and its employees pursuant to this agreement are an integral part of and are essential to the ability of Operator to generate Operator's goods, products and services. Furthermore, Operator and Contractor agree that Operator is a statutory employer of Contractor's employees for purposes of La. R. S. 23:1061 (A) (3). Notwithstanding Operator's status as a statutory employer or special employer (as defined in La. R. S. 23:1031 (C)) of Contractor's employees, Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Operator.

17. Operator, its parent, subsidiary and affiliated corporations, as well as the employees, officers and directors of each (collectively, "Operator") is cognizant of the Nabors Dispute Resolution Program and wishes to become an Electing Entity, as defined in that Program. Accordingly, Operator and Nabors Industries, Inc. ("Nabors") hereby agree that Operator is an Electing Entity as to all Disputes between Operator and the present and former Employees and Applicants of Nabors pursuant to the Nabors Dispute Resolution Program as it currently exists and as may be amended from time to time. In the event the Program is amended, Nabors agrees to provide a copy of the amendment(s) to Operator. Operator may withdraw this election to participate in the Program at any time by giving notice of such withdrawal to Nabors; such revocation to be effective with respect to any claims not yet instituted as of the date of revocation. Operator understands that it is bound by the terms of the Program with respect to all Disputes with Nabors employees, regardless of whether such Dispute is initiated by the employee or by Operator. Operator and Nabors acknowledge that the Program does not apply to disputes between Operator and Nabors and that the Program does not alter the terms of any indemnification agreement between them.

18. Should Operator employ a fixed cutter bit, without the use of a mud motor, Contractor and Operator will negotiate in good faith an increase in the Operating Rate to compensate Contractor for the additional wear and tear on Contractor's equipment. Contractor and Operator will also negotiate in good faith an increase in the rig downtime allowances in recognition of the additional loads placed on Contractor's equipment.

19. In the event Operator elects to drill a substitute well it shall be Operator's obligation to advise Contractor in writing of such change. Notwithstanding Operator's failure to notify Contractor of such change, the terms of this Contract shall apply to such substitute well as if such substitute well were the well specified in Paragraph 1 of the Contract.

20. All tubular inspections, transportation, and repairs will be paid directly to the vendor by the Operator.

21. Any damage incurred during the drilling process to the drill collars or drillpipe accessories will be repaired or replaced by the Operator.

22. All Bop rubber goods that fail during the drilling process will be the responsibility of the Operator.

23. The rig will be allowed ½ hour per tour for rig servicing.

24. Although the rig is provided with 5 man crew, a 4 man crew will not be considered short handed.

25. Drill collars will be provided by hardbanding protection. If any hard band protection is worn beyond the acceptable tolerance it will be replaced and billed directly to the Operator.

26. Contractor will not be required to commence work until Operator provides certificates of insurance evidencing coverage as required within.

27. Notwithstanding any provision contained in paragraph 14, Operator will assume liability at all times and shall reimburse Contractor for any damage to or destruction of Contractor's equipment, including payment of the normal Operating Day rate during repairs of such damages, incurred during moves to, from, or between wells.

28. The rig will be provided with two triplex mud pumps. (One primary and one back up). If one pump is temporarily out of service, the rig will still be considered to be fully functional.

29. Operator is responsible for liners and pistons that are replaced due to wear during drilling operations.

30. OPERATOR SHALL RELEASE CONTRACTOR OF ANY LIABILITY FOR AND SHALL PROTECT, DEFEND, AND INDEMNIFY CONTRACTOR, ITS OFFICERS, DIRECTORS, EMPLOYEES, AND JOINT OWNERS FROM AND AGAINST ALL CLAIMS, DEMANDS, AND CAUSES OF ACTION OF EVERY KIND AND CHARACTER, THAT DIRECTLY OR INDIRECTLY ARISE FROM THE FACT THAT WORK STRING AND ACCESSORIES WERE NOT INSPECTED DURING THE TERM OF THE AGREEMENT.

Signed by the
Parties as correct:

For Contractor _____

For Operator _____



### DRAWWORKS:
Franks Cabot 900 Series, model 2341, with an input rating of 900 horsepower, Parmac V-80 hydromatic brake, crown o matic and Foster catheads, 1-1/8" drill line

### PRIMARY POWER:
Two Caterpillar 3408 engines rated at 450 HP each, equipped with two Allison CLBT 5860 power shift transmissions

### MAST:
Franks Cabot D350-117 telescoping, 117 ft. clear height x 15 ft. base at floor, API static hook load of 350,000 lbs. on 10 lines

### SUBSTRUCTURE:
Franks Cabot, telescoping, with 17 ft. floor height and 13 ft. clear height under the rotary beams — Substructure is designed for a 350,000 lbs. casing load simultaneous with a set back load of 200,000 lbs.

### CARRIER:
Franks Explorer III six axle carrier w/single man cab, rotary drive assembly, air/fuel/hydraulic tanks, drill line w/spool, braden hydraulic winch, folding walkways, 18 x 22.5 front & 11 x 24.5 rear tires w/budd wheels

### Mud pumps:
Two- National F-1000 horsepower mud pumps powered by D-398 caterpillar on each.

### Mud tanks:
700 Bbl system consisting of one 400 Bbl and one 300 Bbl tank with a 50 Bbl slugging compartment in the suction tank, clean out gates, two centrifugal pumps for mud mixing (two 5" x 6" with a 60 H.P. motor) motor), three 10 H.P. mud agitators.

### SOLIDS CONTROL:
1,000 gpm capacity desander & one 800 gpm desilter
Shale Shaker — Harrisburg D-235

## WATER STORAGE:
One 350 Bbl tank

## FUEL STORAGE:
One 7,770 gal tank (185 Bbl)

## ELECTRICAL POWER:
Two Caterpillar DR4 generators rated at 320 KW each powered by Caterpillar D-3408 engines

## HOOK/BLOCK:
Gardner Denver- 200 Ton

## SWIVEL:
National Oilwell P-300

## ROTARY:
Ideco 17 ½"

## ACCUMULATOR:
80 gallon, six station, with an electric triplex pump, one air operated pump, regulating valves and six station remote control

## BLOW OUT PREVENTERS:
11" 5M# Dbl Hydraulic Shaffer B.O.P.
11" 5M# Shafffer Annular Preventer (no outlets)
One 3" to 2" 10M# choke manifold with H2S Trim

## DRILL PIPE:
4-1/2" Drill Pipe  10,000'
6-1/2" Spiral Drill Collars  30 EACH

## MISC. EQUIPMENT:

| | |
|---|---|
| Automatic Driller | One Hydraulic Hoist |
| Wireline Unit | 5-1/4" x 40' Square Kelly |
| Full opening Safety Valve | 0 – 7 Degree Drift Indicator * |
| Vapor proof Lighting System | Inside B.O.P. |
| Gas Buster | Kelly Spinner  Foster |
| Degasser | |
| Lower Kelly Valve | |

## National F-1000
## Triplex Pump

| Piston Diameter | Max Discharge | Max GPM | Max BPM |
|---|---|---|---|
| 4 3/8" | 4900 | 206 | 4.92 |
| 4 ¾" | 4700 | 246 | 5.86 |
| 5 1/8" | 4000 | 289 | 6.88 |
| 5 ½" | 3457 | 335 | 7.97 |
| 6" | 3014 | 385 | 9.17 |
| 6 ½" | 2643 | 438 | 10.43 |
| 6 ¾" | 2343 | 494 | 11.76 |
| | | | |

Calculated at 130 strokes per minute

## CAUSE NO. 2008-386

| | | |
|---|---|---|
| BRENDA AVILES, individually and<br>on behalf of Redacted , a<br>minor child, and on behalf of the<br>Estate of VICTOR FILOMENO<br>AVILES<br><br>V.<br><br>NABORS WELL SERVICES CO. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br><br>PANOLA COUNTY, TEXAS<br><br><br><br>123RD JUDICIAL DISTRICT |

### AFFIDAVIT OF FRANK BUFKIN

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF GREGG | § |

Before me, the undersigned notary, on this day personally appeared Frank Bufkin, a person whose identity is known to me. After I administered an oath to him, he stated:

1.     I am over 18 years old, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.     I am President of Buffco Production, Inc.

3.     On April 13, 2007, Buffco entered into an International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract ("Contract") with Nabors for the purpose of drilling operations. The Contract contains various sections outlining the parties' relationship, including Paragraph 17 of Exhibit "C" entitled "Contractors Special Provisions." This paragraph provides that Buffco is aware of Nabors Industries, Inc.'s Dispute Resolution Program ("DRP") and wishes to become an "Electing Entity" as defined in the DRP. The "Special Provisions" addendum to the Contract was executed by a Buffco representative at the time the contract was entered.

4.     As an "Electing Entity," Buffco was required to resolve disputes with any past or present employee(s) or related entities of Nabors in accordance with the DRP.



EXHIBIT

3

430

5.    On August 20, 2007, the Contract between the parties was in full force and effect and has not been, nor has ever been, found to be unenforceable or severable in whole or in part.

FURTHER AFFIANT SAYETH NOT.

_____
Frank Bufkin

Sworn to and subscribed before me by Andrea Watson on the 8 day of May _____, 2009.

_____
Notary Public in and for
The State of TEXAS

My commission expires on:

Andrea Watson
My Commission Expires
10/18/2012

2

431

| | | |
|---|---|---|
| BRENDA AVILES, individually and | § | IN THE DISTRICT COURT |
| on behalf of Redacted , a | § | |
| minor child, and on behalf of the | § | |
| Estate of VICTOR FILOMENO | § | PANOLA COUNTY, TEXAS |
| AVILES | § | |
| | § | |
| V. | § | |
| | § | |
| NABORS WELL SERVICES CO. | § | 123RD JUDICIAL DISTRICT |

## AFFIDAVIT OF LAURA W. DOERRE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned notary, on this day personally appeared Laura W. Doerre, a person whose identity is known to me. After I administered an oath to her, she stated:

1.    "I am over 18 years old, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.    I am Vice President and General Counsel of Nabors Industries, Inc.

3.    In that capacity, I am required to be familiar with Nabors Industries, Inc.'s corporate structure and the relationship of its various subsidiaries and affiliated companies.

4.    Nabors Well Services Ltd. is a subsidiary of Nabors Industries, Inc.

5.    On April 13, 2007, Buffco Production, Inc. entered into an International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract ("Contract") with Nabors Well Services Ltd. for the purpose of drilling operations. A true and correct copy of the original of the Contract is attached as Exhibit 1 to Buffco's Motion to Compel Arbitration. This record is kept by Nabors Well Services Ltd. in the regular course of business. The Contract contains



EXHIBIT
4

432

various sections outlining the parties' relationship, including Paragraph 17 of Exhibit "C" entitled "Contractors Special Provisions." This paragraph provides that Buffco is aware of the DRP and wishes to become an "Electing Entity" as defined in the DRP. The "Special Provisions" addendum to the Contract was executed by a Buffco representative at the time the contract was entered. This section further states that as a result of Buffco's election, Buffco is rendered an "Electing Entity" and that all disputes between Buffco and past or present employees of Nabors and its related entities would be subject to binding arbitration.

6.      Nabors Industries, Inc. is the "Sponsor" of the Nabors Dispute Resolution Program ("DRP") as that term is defined by the DRP. The DRP applies to all direct and indirect subsidiaries of Nabors Industries, Inc., as well as to all "Electing Entities" that have agreed to be bound by the DRP.

7.      The DRP extends to and includes the employees of Nabors Well Services Ltd.

8.      Based upon my review of the corporate records, Plaintiff Victor Aviles was an employee of Nabors Well Services Ltd. on August 20, 2007, the date of the incident made the basis of this suit.

9.      Nabors Well Services Ltd. is engaged in interstate commerce as it is in the business of drilling for oil and gas resources that are placed into commerce in both Texas and other states of the United States.

10.     In connection with Victor Aviles's commencement and/or continued employment with Nabors Well Services Ltd., Mr. Aviles executed "An Application for Hourly and Daily Employment," "Notice to Applicants Regarding Dispute Resolution Program," and "Employee

2

433

Acknowledgment Concerning Nabors Dispute Resolution Program," which agreements are attached as Exhibits 4 and 5 to Buffco's Motion to Compel Arbitration. These records are kept by Nabors Well Services Ltd. in the regular course of business, and it was the regular course of business of Nabors Well Services Ltd. for an employee or representative of Nabors Well Services Ltd., with knowledge of the act or event that was recorded, to make these records or to transmit the information to be included in these records. These records were made at or near the time or reasonably soon after the act or event that was recorded. The records attached as Exhibits 4 and 5 are true and correct copies of the originals.

11.     Attached as Exhibits 6a and 6b to Buffco's Motion to Compel Arbitration is Nabors Industries, Inc.'s DRP booklet (in English and Spanish, respectively). These records are kept by Nabors Industries, Inc. in the regular course of business. Exhibits 6a and 6b accurately reflect the terms of the DRP, which was in full force and effect on August 20, 2007. The records attached as Exhibits 6a and 6b are true and correct copies of the originals."

FURTHER AFFIANT SAYETH NOT.

*(signature)*

Laura W. Doerre

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

Sworn to and subscribed before me by Laura W. Doerre on the 15 day of May, 2009.

*(signature)*

Notary Public in and for
The State of TEXAS
My commission expires on:  8-23-11

Shelia M. McGee
Notary Public, State of Texas
My Commission Expires
August 23, 2011

3

434

**THE STATE OF TEXAS**

**COUNTY OF BOWIE**

I, DEBRA K. AUTREY, Clerk of the Court of Appeals for the Sixth Judicial District of Texas, do hereby certify that the above and foregoing is a true and correct copy of the Brief of Appellants as filed herein on the 10th day of May, 2010, in Cause No. 06-10-00018-CV, styled Nabors Well Services Co., a/k/a Nabors Well Services, Ltd., and Buffco Production, Inc. v. Brenda Aviles, Individually and on behalf of Redacted , a Minor Child, and on behalf of the Estate of Victor Filomeno Aviles, as the same now appear on file in my office.

IN TESTIMONY WHEREOF, witness my hand and official seal of office in the City of Texarkana, Texas, this the 22nd day of October, 2015.

**DEBRA K. AUTREY, Clerk**
**SIXTH COURT OF APPEALS**
**Texarkana, Texas**

By _Kim Robinson_
**Deputy Clerk**

CAUSE NO. 14,542

| | | |
|---|---|---|
| PERRY MOLETT | § | IN THE DISTRICT COURT |
| *Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | |
| COT OIL TOOL, INC., CINTAS | § | |
| CORPORATE SERVICES, INC., CITAS | § | 21st JUDICIAL DISTRICT |
| CORPORATION NO. 2, | § | |
| CINTAS CORPORATION NO. 8, and | § | |
| ENERVEST OPERATING, L.L.C. | § | |
| *Defendants* | § | LEE COUNTY, TEXAS |

## <u>DEFENDANT, ENERVEST OPERATING, L.L.C.'S NOTICE OF APPEAL</u>

Pursuant to Texas Rule of Appellate Procedure 25, Defendant, ENERVEST OPERATING, L.L.C. ("EnerVest"), files its Notice of Appeal of this Court's appealable Order on Defendant, EnerVest's Motion to Compel Arbitration ("Order") signed by the Honorable Dan R. Beck on November 15, 2011 (Exhibit "1"), and respectfully would show:

1. This case is pending in the 21st Judicial District Court of Lee County, Texas under Cause Number 14,542;

2. The Order denying EnerVest's Motion to Compel Arbitration was signed on November 15, 2011;

3. EnerVest desires to appeal from the referenced Order;

4. EnerVest appeals to the Third Court of Appeals, Austin, Texas;

5. EnerVest Operating, L.L.C. is filing this notice;

6. This is an accelerated appeal pursuant to TEX. R. APP. P. 28.

EnerVest respectfully requests that this Court take notice of EnerVest's desire and intention to appeal. EnerVest further requests that this notice be forwarded to the Sixth Court of Appeals as required by the rules and/or local procedure so that EnerVest may tender the appropriate fee to the appellate clerk and proceed with its appeal.

**FILED**

DEC 01 2011 9:30 am

DISTRICT CLERK
LEE COUNTY, TEXAS

DEPUTY

STATE OF TEXAS
COUNTY OF LEE } This is to certify that this is a true copy of the original

OCT 2? 2015

LISA TEINERT
DISTRICT CLERK
LEE COUNTY, TEXAS

EXHIBIT I

Respectfully submitted,

Thomas J. Smith
State Bar No. 00788934
Kelly C. Hartmann
State Bar No. 24055631
Alexis M. Butler
State Bar No. 24072807
GALLOWAY, JOHNSON, TOMPKINS
BURR & SMITH
1301 McKinney, Suite 1400
Houston, Texas 77010
(713) 599-0700 – telephone
(713) 599-0777 – facsimile

ATTORNEYS FOR DEFENDANT, ENERVEST
OPERATING, L.L.C.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon the following counsel via certified mail return receipt requested on this 29th day of November, 2011.

Gaines West and Jennifer Jasper
WEST, WEBB, ALLBRITTON & GENTRY, P.C.
1515 Emerald Plaza
College Station, Texas 77845
*Attorneys for Plaintiff, Perry Molett*

Bret A. Sanders
FEE, SMITH, SHARP & VITULLO, L.L.P.
816 Congress Ave., Suite 1265
Austin, Texas 78701
*Attorneys for Defendant COT Oil Tool, Inc.*

R. Andrew Schulz
MARTIN, DISIERE, JEFFERSON & WISDOM, LLP
900 South Capital of Texas Highway, Suite 425
Austin, Texas 78746
*Attorneys for Defendant Cintas Corporate Services*
*& Cintas Corporation No.619*

Kelly C. Hartmann

THE STATE OF TEXAS
COUNTY OF LEE
This is to certify that this is a true copy of the original

OCT 20 2015

LISA TEINERT
DISTRICT CLERK
LEE COUNTY, TEXAS

CAUSE NO. 14,542

| | | |
|---|---|---|
| PERRY MOLETT | § | IN THE DISTRICT COURT |
| *Plaintiff* | § | |
| | § | |
| VS | § | |
| | § | |
| | § | 21st JUDICIAL DISTRICT |
| | § | |
| COT OIL TOOL, INC., CINTAS | § | |
| CORPORATE SERVICES, INC., | § | |
| CINTAS CORPORATION NO. 2, | § | |
| CINTAS CORPORATION NO. 8, and | § | |
| ENERVEST OPERATING, L.L.C. | § | |
| *Defendants* | § | LEE COUNTY, TEXAS |

<u>ORDER DENYING MOTION TO COMPEL ARBITRATION</u>

On November 15, 2011 this Court considered Defendant EnerVest Operating, L.L.C.'s

Motion to Compel Arbitration and to Abate, Plaintiff's Opposition thereto, EnerVest's Reply, the

pleadings in this case, arguments of counsel, and any evidence. The Motion is DENIED in its

entirety.

SIGNED on this the 15 day of Nov. , 2011.

_____
PRESIDING JUDGE

FILED

11.15.11
9:51 am
Lisa Teinert
DISTRICT CLERK
LEE COUNTY, TEXAS

Entered

**EXHIBIT**
tabbies
**1**

THE STATE OF TEXAS } This is to certify that this
COUNTY OF LEE } is a true copy of the original

VOLUME 92   PAGE 465 2015

LISA TEINERT
DISTRICT CLERK
LEE COUNTY, TEXAS



2012 WL 1106881 (Tex.App.-Austin) (Appellate Brief)
Court of Appeals of Texas, Austin.

ENERVEST OPERATING, L.L.C., Appellant.,

v.

Perry MOLETT, Appellee.

No. 03-11-00823-CV.
March 8, 2012.

On Appeal from the 21st Judicial District Court, Lee County, Texas Cause No. 14,542
Oral Argument Requested

**Brief of Appellants**

Galloway, Johnson, Tompkins Burr & Smith, Thomas J. Smith, State Bar No. 00788934, Kelly C. Hartmann, State Bar No. 24055631, Alexis M. Butler, State Bar No. 24072807, 1301 McKinney, Suite 1400, Houston, Texas 77010, Telephone: (713) 599-0700, Facsimile: (713) 599-0777.

*iv TABLE OF CONTENTS

| | |
|---|---|
| IDENTITY OF PARTIES AND COUNSEL | ii |
| TABLE OF CONTENTS | iv |
| INDEX OF AUTHORITIES | vi |
| STATEMENT OF THE CASE | x |
| STATEMENT REGARDING ORAL ARGUMENT | xi |
| STATEMENT OF THE ISSUE | 1 |
| STATEMENT OF FACTS | 2 |
| 1. Underlying lawsuit | 2 |
| 2. The DRP | 2 |
| 3. Appellee's Agreement | 4 |
| 4. Appellant's Motion to Compel Arbitration | 4 |
| SUMMARY OF THE ARGUMENT | 5 |
| ARGUMENT | 6 |
| I. This Court has Jurisdiction over this Appeal pursuant to the Texas Arbitration Act | 6 |
| II. Standard of Review | 6 |
| III. The trial court committed a clear abuse of discretion when it denied Appellant's Motion to Compel Arbitration | 7 |
| A. Valid Agreement to Arbitrate | 9 |
| B. The Dispute Falls Within the Scope of the Agreement | 11 |
| IV. There is No factual or Legal Basis to Substantiate any of Appellees' Alleged Defenses to the Arbitration Agreement | 13 |
| A. Appellant is a Party to Nabors Dispute Resolution Plan | 13 |
| B. Appellant is a Third-Party Beneficiary to the Contract between Nabors and Appellee | 17 |
| i. Evidence of Intent | 17 |
| ii. No Requirement of Specific Identification by Name. | 19 |
| iii. "Electing Entity" is Sufficiently Designated to Identify the Parties Benefitted | 21 |
| iv. Appellee's Reliance Upon In re Bayer Materialscience ignores Factual Distinctions and *V Applicable Law | 24 |
| C. Appellant May Enforce the DRP Pursuant to the Doctrine of Incorporation by Reference | 27 |
| D. The DRP Is Not Illusory, Unconscionable, or Lacking Mutual Assent | 29 |
| CONCLUSION | 32 |
| PRAYER | 33 |
| CERTIFICATE OF SERVICE | 34 |

## EXHIBIT J

APPENDIX ............................................................................................................................... 35

*vi  INDEX OF AUTHORITIES

CASES

*Alex Sheshunoff Mgmt. Servs., v. Johnson,* 50 Tex. Sup.Ct. J. 44, 2006 WL 2997287 (Tex. 2006) ........................................ — 28

*ANCO Ins. Services of Houston, Inc. v. Romero,* 27 S.W.3d 1 (Tex.App.-San Antonio, 2000) ............................................... — 6

*Associated Glass, Ltd. v. Eye Ten Oaks Invs., Ltd.,* 147 S.W.3d 507 (Tex. App - San Antonio 2004, no pet.) ............. — 8

*Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223 (Tex. 1991) . — 6

*Black & Vernooy Architects v. Smith,* 2011 WL 3435679 (Tex. App. - Austin Aug. 5, 2011, no pet. h.) ........................ — 17

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan,* 345 F.3d 347, 355, 358 (5th Cir.2003) ............................................. — 13

*Cantella & Co. v. Goodwin,* 924 S.W.2d 943 (Tex. 1996) ...... — 7

*Cappadonna Elec. Management v. Cameron County,* 180 S.W.3d 364, 373 (Tex. App. - Corpus Christi 2005, no pet.) ... — 27

*Circuit City Stores, Inc. v. Adams,* 121 U.S. 1302 (2001) ....... — 2, 7

*City of Alamo v. Garcia,* 878 S.W.2d 664 (Tex. App. - Corpus Christi 1994, no writ) ............................................. — 2

*City of Port Isabel v. Shiba,* 976 S.W.2d 856, 858 (Tex. App. - Corpus Christi 1998, pet. denied) ............................. — 27

*Dallas Cardiology Assoc, P.A. v. Mallick,* 978 S.W.2d 209 (Tex. App. - Dallas, 1998, pet. denied) .............................. — 8

*D.R. Horton, Inc. v. Brooks,* 207 S.W.3d 862, 867 (Tex.App. - Houston [14 Dist], 2006) ........................................ — 29

*EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87 (Tex. 1996) ........ — 8

*Folse v. Richard Wolf Medical Instruments Corp.,* 56 F.3d 603 (5th Cir.1995) ................................................. — 8

*Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 528 (5th Cir.2000) ................................................ — 13

*Ikon Office Solutions, Inc. v. Eifert,* 2 S.W.3d 688 (Tex. App. - Houston [14th Dist.] 1999, orig. proceeding) ............... — 11

*In re 24R, Inc.,* 324 S.W.3d 564 (Tex., 2010) ................... — 29, 31

*In re AdvancePCS Health L.P.,* 172 S.W.3d 603 (Tex. 2005) (orig. proceeding) ................................................... — 28

*In re American Homestar of Lancaster, Inc.,* 50 S.W.3d 480 (Tex. 2001) ......................................................... — 6

*vii  In re Bayer Materialscience LLC,* 265 S.W.3d 452 (Tex. App.-Houston [1st Dist.] 2007, orig. proceeding) .......... — 23, 24, 25

*In re Bunzl USA,* 155 S.W.3d 202 (Tex. App.-El Paso 2004, orig. proceeding) ................................................... — 10

*In re C & H News Co.,* 133 S.W.3d 642, 645 (Tex. App.-Corpus Christi 2003, orig. proceeding) ............................. — 26, 27, 29, 30

*In re Citgo Petroleum Corp.,* 248 S.W.3d 769 (Tex. App.-Beaumont 2008, orig. proceeding) ................................ — 19, 20, 21, 22, 25

*In re D. Wilson Constr. Co.,* 196 S.W.3d at 781 .................. — 8

*In re Dallas Peterbilt, Ltd., L.L.P.,* 196 S.W.3d 161 (Tex. 2006) ..................................................... — 9

*In re Halliburton,* 80 S.W.3d 566 (Tex. 2002) .................... — 9, 29

*In re Jim Walter Homes, Inc.,* 207 S.W.3d 888 (Tex. App.--- Houston [14th Dist.] 2006) ...................................... — 8

*In re Labatt Food Service, L.P.,* 279 S.W. 3d 640 (Tex. 2009) ......................................................... — 13

*In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571 (Tex. 1999) (orig. proceeding). .......................................... — 7

*In re Raymond James & Associates, Inc.*, 196 S.W.3d 311, 319 (Tex. App.---Houston [1 Dist.] 2006, no pet.) ................. 27, 28

*In re Rolland*, 96 S.W.3d 339 (Tex. App.---Austin 2001, orig. proceeding) ........................................................... 13

*In re RRGT, Inc.*, 2006 WL 622736 (Tex. App.-San Antonio 2006, orig. proceeding) ..................................... 9

*In re Rubiola*, 334 S.W.3d 220, 226 (Tex., 2011) .................. 13, 14, 15, 16, 17

In re: Kellogg Brown & Root, Inc., 166 S.W.3d 732 (Tex. 2005) ........................................................................ 13, 26

*J.M. Davidson, Inc. v. Webster*, 49 S.W.3d 507 (Tex.App.-Corpus Christi, 2001) ............................................... 6

*Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266 (Tex. 1992) (orig. proceeding) ......................................................... 7

*Jackson v. Van Winkle*, 660 S.W.2d 807 (Tex. 1983) ............. 6

*Knox v. Ball*, 191 S.W.2d 17, 23 (Tex. 1945) ....................... 24

*Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642 (Tex.1994) .............................................................. 28

*Loyd v. ECO Res., Inc.*, 956 S.W.2d 110 (Tex. App.---Houston [14th Dist.] 1997, no pet.) ............................ 18

*Maddox v. Vantage Energy, LLC,*---.W.3d ---, 2012 WL 407269 (Tex. App.--Fort Worth Feb. 09, 2012, no pet. h.) ...... 17, 18, 19, 20

*MCI Telecomms. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647 (Tex. 1999) ....................................................... 18

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) ........................................... 8

*\*Viii  MJR Corp. v. B & B Vending Co.*, 760 S.W.2d 4 (Tex.App.-Dallas 1988, writ denied) .......................... 25

*Moritz v. Preiss*, 121 S.W.3d 715 (Tex. 2003) ...................... 6

*Nabors Drilling USA, LP v. Carpenter*, 198 S.W.3d 240 (Tex. App. - San Antonio 2006, orig. proceeding) ............ 9

*Nelson v. Louisiana Electric Rig Service*, 2006 WL 5671234 (C.D. Cal. Feb. 22, 2006) ........................................ 21

*Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968) .......... 26

*Palm Harbor Homes v. McCoy*, 944 S.W.2d 716 (Tex.App. - Ft. Worth 1997) ................................................... 2

*Prudential Secs., Inc. v. Marshall*, 909 S.W.2d 896 (Tex.1995) .......................................................... 11

*Prudential-Bache Secs., Inc. v. Garza*, 848 S.W.2d 803 (Tex. App.-Corpus Christi 1993) ............................ 11

*R.M. Perez & Assocs., Inc. v. Welch*, 960 F.2d 534 (5th Cir.1992) ........................................................... 8

*Shearson Lehman Bros., Inc. v. Kilgore*, 871 S.W.2d 925 (Tex.App. - Corpus Christi, 1994, orig. proceeding) .............. 7

*Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 382 (5th Cir., 2008) ........................................................ 16

*Southland Corp v. Keating*, 465 U.S. 1 (1984) ....................... 2

*Stine v. Stewart*, 80 S.W.3d 586 (Tex. 2002) ........................ 17

*Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) .............. 19

*Teal Constr. Co./Hillside Villas Ltd. v. Darren Casey Interests, Inc.*, 46 S.W.3d 417, 420 (Tex. App. - Austin 2001 pet. denied) .................................................... 26

*Tenet Healthcare Ltd. v. Cooper*, 960 S.W.2d 386 (Tex. App. - Houston [14th Dist.] 1998, pet. dism'd w.o.j.) .............. 7

*Walker v. Packer*, 827 S.W.2d 833 (Tex. 1992) ..................... 7

*Wolfe v. Speed Fab-Crete Corp. Int'l*, 507 S.W.2d 276, 278 (Tex. Civ. App. - Fort Worth 1974, no writ) ............... 27

*In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672 (Tex., 2006) ....................................................................... 10, 29, 31

STATUTES, RULES & REGULATIONS

Civil Practice & Remedies Code § 171.001 et seq .................. 8

Civil Practice & Remedies Code § 171.098(a)(1) ................... 6

Restatement (Second) Of Contracts § 308 (1981) .................. 20, 24, 31

 *ix Texas Rule Of Appellate Procedure 28(a) ...................... 6

9 U.S.C. § 1 et seq ................................................................. 8

9 U.S.C. § 2 ......................................................................... 2

## *x STATEMENT OF THE CASE

Pursuant to Rule 38.1(d), Appellant, EnerVest Operating, L.L.C. submits the following statement of the case. Appellee, Perry Molett, filed a personal injury lawsuit against Appellant and several other entities for injuries sustained while in the course and scope of his employment with Nabors Wells Services, Ltd. ("NWS").[1] Simultaneously, with its answer, Appellant sought an order from the Trial Court compelling arbitration. After oral argument, the Trial Court denied Appellant's Motion to Compel Arbitration.[2]

Appellant brings this instant appeal of the Trial Court's Order of November 15, 2011 denying Appellant's Motion to Compel Arbitration and stay the underlying case.[3]

## *xi STATEMENT REGARDING ORAL ARGUMENT

Appellant believes that oral argument is necessary and will aid the court significantly in deciding this matter. Oral argument will allow the Court to analyze the legal issues presented in this appeal more thoroughly by permitting counsel to answer questions regarding the contractual issues and the underlying arbitration agreement that is at the heart of this appeal.

## *1 STATEMENT OF THE ISSUE

1. Whether the Trial Court committed a clear abuse of its discretion when it denied Appellant's Motion to Compel Arbitration and refused to stay the underlying case, in the absence of any factual or legal basis to do so.

## *2 STATEMENT OF FACTS

### 1. Underlying lawsuit

Appellee, Perry Molett, was injured on May 2, 2010 in Washington County, Texas.[1] The accident occurred while Appellee was working as a crew worker on a land based drilling rig in the course and scope of his employment with Nabors Well Services, Ltd. ("NWS").[2]

### 2. The DRP

At the time of the accident, Nabors Industries, Inc. ("Nabors") and its subsidiaries, including NWS, had in effect with Appellee a valid arbitration agreement known as the Dispute Resolution Program ("DRP").[3] The DRP is subject to the Federal Arbitration Act ("FAA") and,[4] by its terms, is designed to provide a means for the resolution of disputes between the Company and the Company's present and former Employees related to or arising out of a current or former employment relationship with the

Company.[5] The DRP defines "Dispute" to include a personal injury that is incurred at the workplace or in the course and scope of employment.[6]

**\*3** The DRP defines "Company" as "Sponsor and every direct and indirect subsidiary...of Sponsor, (and) any Electing Entity."[7] Nabors is the "Sponsor" of the DRP, as that term is defined by the DRP.[8] NWS is a subsidiary of Nabors.[9] The DRP extends to and includes the employees of NWS.[10] Further, Appellant is an "Electing Entity" that agreed to be bound by the terms of the DRP.[11] As an "Electing Entity", Appellant is also required to resolve disputes with any past or present employee(s) or applicant of NWS in accordance with the DRP.[12]

### 3. Appellee's Agreement

On April 21, 2003, Appellee executed a document entitled "Application For Hourly And Daily Employment."[13] Appellee affixed his signature to the Application, acknowledging and agreeing that he is "required to adhere to the Dispute Resolution Program and its requirement for submission of all claims to...arbitration."[14]

On July 14, 2003, Appellee executed another document entitled "Employee Acknowledgement Concerning Nabors Dispute Resolution Program."[15] The document specifically states, "I have received a copy of the Nabors Dispute Resolution Program."[16] Appellee again signed and acknowledged and agreed that he was "required to adhere to **\*4** the Dispute Resolution Program and its requirement for submission of all claims to...arbitration."[17] Appellee has never denied that he executed either document.[18]

### 4. Appellant's Motion to Compel Arbitration

On October 25, 2011, Appellant filed its Motion to Compel Arbitration and to Abate, and the matter was set for hearing on November 15, 2011.[19] Counsel appeared and the trial court conducted the hearing on Appellant's motion. No live testimony was taken at the hearing. Immediately after the hearing, on November 15, 2011, the Court entered an Order denying EnerVest's Motion, which is the subject of this proceeding.[20] This expedited appeal was timely perfected on December 1, 2011.[21]

### *5 SUMMARY OF THE ARGUMENT

The Trial Court abused its discretion when it denied Appellant's Motion to Compel Arbitration because there was no factual or legal basis to deny the Motion to Compel Arbitration. Nabors Industries, Inc. and its subsidiaries have a valid arbitration program, the DRP, that requires disputes involving injuries to employees which are incurred at the workplace or during the course and scope of employment to be submitted to final and binding arbitration. The DRP applies to all direct and indirect subsidiaries of Nabors, all current and former employees of the aforementioned subsidiaries, and any "Electing Entity" that has agreed to be bound by the terms of the DRP. Appellant is an electing entity and agreed to be bound by the terms of the DRP. Further, Appellee acknowledged and accepted the terms of the DRP, thereby entering into a valid arbitration agreement. Appellee's claims against Appellant fall within the scope of the DRP. Therefore, Appellant's Motion to Compel Arbitration

should have been granted and the underlying case should have been abated or dismissed and compelled to final and binding arbitration.

## *6 ARGUMENT

### I. This Court has Jurisdiction over this Appeal pursuant to the Texas Arbitration Act.

This Court has jurisdiction under Texas Rule of Appellate Procedure 28 and Texas Civil Practice and Remedies Code Section 171.098(a)(1). Section 171 provides that a party may appeal an order "denying an application to compel arbitration made under Section 171.021."[22] Rule 28 provides for the acceleration of "appeals required by law to be filed or perfected within less than 30 days after the date of the order or judgment being appealed."[23]

### II. Standard of Review

Appellate courts review a trial court's determination concerning the existence of an arbitration agreement under an abuse of discretion standard.[24] The determination of whether a trial court abused its discretion is a question of law.[25] A trial court abuses its discretion when it acts arbitrarily and unreasonably, without reference to guiding rules or principles, or when it misapplies the law to the established facts of the case.[26] "A trial court has no discretion to determine what the law is or in applying the law to the facts and, consequently, the trial court's failure to analyze or apply the law correctly is an abuse of discretion."[27] Legal conclusions, however, are reviewed *de novo*.[28] Whether an *7 agreement imposes a duty on the parties to arbitrate a dispute is a matter of contract interpretation and a question of law for the court.[29]

A party seeking to compel arbitration must establish the existence of an arbitration agreement and show that the claims raised in the particular lawsuit fall within the scope of that agreement.[30] If one of the parties denies that there is a binding arbitration agreement, the trial court may decide whether to compel arbitration on the basis of uncontroverted affidavits, pleadings, discovery, and stipulations.[31]

### III. The trial court committed a clear abuse of discretion when it denied Appellant's Motion to Compel Arbitration.

When the trial court denied Appellant's motion to compel arbitration, it misapplied state law thereby committing a clear abuse of discretion that warrants reversal. There is a strong presumption in Texas favoring arbitration.[32] If a valid arbitration agreement exists, and the claims are within the scope of the agreement, a trial court has no discretion and must compel arbitration.[33]

The clear language of the DRP states that the Federal Arbitration Act, 9 U.S.C. § 1, et. seq. ("FAA") is controlling.[34] Further, Nabors and Appellant are both engaged in interstate commerce as they are in the business of drilling for oil and gas resources that *8 are placed into commerce in both Texas and other states of the United States.[35] The Texas Supreme Court has held that in cases where the FAA is stated in the agreement as the controlling law, the FAA prevails.[36] In adjudicating a motion to compel arbitration under the FAA, courts generally try to determine whether the parties agreed to arbitrate the dispute in question.[37]

Under the FAA, the court applies ordinary state contract law principles in order to decide whether a valid arbitration agreement exists.[38] Once the existence of an arbitration agreement has been established, a presumption attaches favoring arbitration.[39]

Once the movant establishes an agreement to arbitrate, the court must then determine whether the arbitration agreement covers the non-movant's claims.[40] To determine whether an existing arbitration agreement covers a party's claims, a court must focus on the complaint's factual allegations rather than the legal causes of action asserted.[41]

Thus, two questions guide the determination: 1) is there a valid agreement to arbitrate; and 2) does the dispute in question fall within the scope of the agreement?[42]

### *9 A. Valid Agreement to Arbitrate

An "at-will" employee who receives notice of an employer's arbitration policy and continues or commences employment accepts the terms of the agreement as a matter of law.[43] In *In re Halliburton,* the employer created a dispute resolution program which obligated both employees and the employer to arbitrate all disputes between them.[44] The Texas Supreme Court held that the employer was justified in giving notice to all employees of the program and informing them that by continuing to work after the adoption of the program, employees would be considered to have accepted the program.[45]

The Fourth Court of Appeals has extended *Halliburton* even further. Relying on *Halliburton,* the Fourth Court of Appeals compelled arbitration where the employee expressly refused to sign an arbitration agreement, but continued to work after receiving notice of the arbitration requirement.[46]

It should also be noted that at least one Court of Appeals has already considered the Nabors DRP specifically and held that the DRP is valid and enforceable.[47]

In this case, Appellee executed documents that clearly express Appellee's agreement to the terms of the DRP.[48] The documents specifically state that Appellee acknowledged receiving, reviewing, understanding, and accepting the DRP's requirement *10 to submit disputes to arbitration.[49] Further, even though *Halliburton* and other decisions make it clear that a signature is not required to create an acceptance of an arbitration agreement, Appellee's signature on the aforementioned documents provides strong evidence of his acknowledgment and agreement that he is required to adhere to the DRP.[50]

Additionally, Appellee acknowledged receiving the DRP which specifically references the types of claims applicable to the dispute resolution process and the entities potentially subject to the DRP.[51] The DRP defines an "Electing Entity" as "any legal entity that has agreed to be bound by the Program as provided herein."[52] The DRP further provides that corporations or other legal entities can elect to be bound by the DRP by written agreement with Nabors.[53] As noted above, Appellant was an Electing Entity at all times relevant.[54] Accordingly, at the time Appellee executed the forms and commenced or continued employment, he had been provided with the DRP for his review and accepted its terms as a matter of law; thus, a valid and enforceable agreement to arbitrate claims within the scope of the DRP including all claims against an Electing Entity such as Appellant.[55]

### *11 B. The Dispute Falls Within the Scope of the Agreement

Appellee's claims fall within the scope of the DRP. The DRP requires that Disputes, including personal injuries sustained in the course and scope of employment, between the Company (defined as Nabors, its subsidiaries, and any "Electing Entity") and its current or former employees be submitted to arbitration. According to Appellee's Second Amended Petition, Appellee was an employee of a Nabors' subsidiary when he was injured while in the course and scope of his employment and is asserting claims against Appellant as a result of these personal injuries.[56] Consequently, this Dispute, which is between Appellee and Appellant (an "Electing Entity"), falls within the scope of the DRP.[57]

Whether a claim falls within the scope of an arbitration agreement depends on the factual allegations of the complaint, rather than the legal cause of action asserted.[58] Based on the factual allegations of Appellee's Petition, Appellee's claims fall squarely within the scope of the DRP.

It is undisputed that Appellee was employed by NWS, which is a Nabors' subsidiary.[59] It is undisputed that Appellee alleges he was injured at the workplace and/or in the course and scope of his employment.[60]

**\*12** Appellee signed an acknowledgement that specifically states, "I have received a copy of the Nabors Dispute Resolution Program...and understand that I am required to adhere to the Dispute Resolution Program and its requirement for submission of disputes to...arbitration".[61] All of these terms are clearly defined in the DRP.[62] Further, the DRP clearly and unequivocally states that it "applies to and binds the Company, each Employee and Applicant."[63] The DRP defines "Dispute" to include any personal injury that is incurred at the workplace or in the course and scope of employment.[64] According to the DRP, "Company" means "Sponsor and every direct and indirect subsidiary...of Sponsor, (and) any Electing Entity."[65]

Nabors is the "Sponsor" of the DRP, NWS is a subsidiary of Nabors, and Appellant is an "Electing Entity" that agreed to be bound by the terms of the DRP.[66] Therefore, Appellant is included in the definition of "Company."

As a result, Appellee's claims fall within the scope of the arbitration agreement. Consequently, Appellant's Motion to Compel Arbitration should be granted and this case should be abated or dismissed and compelled to final and binding arbitration.

### IV. There is No factual or Legal Basis to Substantiate any of Appellees' Alleged Defenses to the Arbitration Agreement.

### A. Appellant is a Party to Nabors Dispute Resolution Plan

**\*13** Despite Appellee's argument to the contrary, Appellant qualifies as a party to the Nabors DRP and is, therefore, entitled to enforce the agreement against Appellee. An obligation to arbitrate not only attaches to one who has personally signed the written arbitration agreement but may also bind a non-signatory under principles of contract law and agency. While parties must sign arbitration agreements before being bound by them,[67] the Texas Supreme Court has recognized six general theories that can bind a non-signatory to an arbitration agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third-party beneficiary.[68] By extension, "if parties to a contract agree to confer certain contractual benefits on a third party, that third party may invoke the contract's arbitration clause."[69] Although "[a]rbitration agreements apply to nonsignatories only in rare circumstances [,]" the question of "[w]ho is actually bound by an arbitration agreement is [ultimately] a function of the intent of the parties, as expressed in the terms of the agreement."[70]

The Texas Supreme Court recently held in *In re Rubiola* that "signatories to an arbitration agreement may identify other parties in their agreement who may enforce arbitration as though they signed the agreement themselves."[71] The underlying arbitration agreement that was the center of the dispute in *In re Rubiola* was similar to the **\*14** DRP. Further, just as in the present matter, in that case the issue was not whether a non-signatory may be compelled to arbitrate but rather whether a non-signatory may compel arbitration.[72]

*In re Rubiola* involved the purchase of a home by Brian and Christina Salmon from Greg and Catherine Rubiola, with J.C. Rubiola acting as listing broker for the transaction.[73] Brothers Greg and J.C. Rubiola jointly operated a number of real estate and mortgage companies in San Antonio, including Rubiola Management, L.L.C. and Rubiola Mortgage Company.[74] The

Rubiola's various business entities operated at the same location under the name Rubiola Mortgage and Realty.[75] The parties' purchase agreement was a standard Texas real estate sales contract and did not contain an arbitration clause.[76] However, the Salmons obtained mortgage financing from Rubiola Mortgage Company and signed an arbitration agreement as part of the mortgage process.[77] Although the only signatories to the arbitration agreement were the Salmons and J.C. Rubiola, in dual capacity as real estate agent and mortgage broker, the agreement had a broad definition of the parties.[78]

Several months later, the Salmons sued the Rubiola brothers in their individual capacity along with other business entities involved in repairing the home.[79] The *15 Rubiolas moved to compel arbitration pursuant to the mortgage finance agreement arguing that the agreement included both the brothers.[80] The trial court denied the Rubiolas' motion and the court of appeals likewise refused to compel arbitration during a *mandamus* proceeding.[81] The Rubiolas then sought *mandamus* review before the Supreme Court of Texas.[82]

The Salmons argued that because none of the Rubiolas signed the arbitration agreement, except J.C., who signed only as the representative of Rubiola Mortgage Company, then none of them were entitled to compel the Salmons to arbitrate.[83] The Texas Supreme Court held however, that the arbitration agreement expressly provided that certain non-signatories were to be parties to the agreement.[84] The agreement defined parties to include "Rubiola Mortgage Company, and each and all persons and entities that sign this agreement or any other agreements between or among any of the parties as part of this transaction."[85] Parties further included "individual partners, affiliates, officers, directors, employees, agents, and/or representatives of any party to such documents."[86]

The Court found that the arbitration agreement's broad definition of parties, at a minimum, made J.C. and Greg Rubiola parties to the arbitration agreement because Rubiola Mortgage Company signed the arbitration agreement, and the Rubiola brothers as officers and representatives of the mortgage company were non-signatory parties to the *16 arbitration agreement under the agreement's terms.[87] Because the arbitration agreement expressly provided that certain non-signatories were considered parties, the Court held that such parties may compel arbitration under the agreement.[88]

In this matter the intent of the parties with respect are parties to the DRP is clearly expressed in the document. "Cpmpany" is defines to include "Electing Entities."[89] "Electing Entities" is defined to included entities which have agreed to resolve disputes with any past or present employee(s) or applicant of NWS in accordance with the DRP.[90] The definition of "Electing Entity" encompasses and includes Appellant.[91] Because the DRP expressly provides that certain non-signatories called "Electing Entities" are considered parties, Appellant is a party to and may compel arbitration under the agreement.[92]

## B. Appellant is a Third-Party Beneficiary to the Contract between Nabors and Appellee

To the extent this Court does not find that Appellant qualifies as a party to the DRP, Appellant is alternatively entitled to enforce the arbitration agreement against *17 Appellee as a third-party beneficiary of the DRP. It is well settled that in order to be a third-party beneficiary to a contract, the original contracting parties must have "intended to secure a benefit to the third party" and must have entered the contract "directly for the third party's benefit."[93] This should not, however, be misconstrued to mean that the sole purpose of the underlying contract must have been for the third-party's benefit, or that the third-party must be specifically named or expressly identified in the underlying contract.[94]

## i. Evidence of Intent

Instead, courts require a showing of intent to ensure that those parties who receive a mere incidental benefit to the contract do not then gain the right to enforce the contract against the original parties.[95] The often discussed presumption against a finding of third-party beneficiary status is in place to safeguard against an *unintended* party from deriving a benefit from the contract or enforcing it.[96] However, when intent to confer a benefit upon a third party is "clearly and fully" expressed in the underlying contract, the presumption against third-party beneficiaries may be overcome.[97]

**\*18** In the present matter, the arbitration agreement clearly and fully expresses intent to confer the benefit of arbitration upon Electing Entities. The Nabors DRP states, under the provision specifically titled "11. Electing Entities," that "Corporations or other Electing Entities not otherwise Parties, may elect to be bound by this Program by written agreement with Sponsor" so that "[a]ll Disputes not otherwise settled by the Parties shall be...resolved under this Program."[98] In other words, when a legal entity contracts with Nabors and elects into the DRP, it becomes both benefitted and bound to arbitrate disputes with Nabors' employees. Because there is clear, full, and express intent to benefit Electing Entities, those Electing Entities can not be considered unintended or incidental to the contract so that they are precluded from qualifying as third-party beneficiaries.

### ii. No Requirement of Specific Identification by Name

Clear and full expression of intent does not, however, require that third-party beneficiaries be specifically indentified by name. In citing Texas Supreme Court case law regarding this issue, the Fort Worth Court of Appeals recently stated in *Maddox v. Vantage Energy, LLC* that a "third-party beneficiary need not be specifically named in the contract but must be otherwise sufficiently described or designated."[99] In other words, the original parties to a contract may agree to benefit a group of entities by designating that group, and need only to clearly and fully express their intent to do so.[100]

**\*19** The *Maddox* court, which dealt with homeowners seeking to enforce a purported contract between a neighborhood association and an oil and gas company, ultimately held that the homeowners could not show that they were part of an "identified, discrete, limited group" that was "intended to be third-party beneficiaries" to the contract.[101] The court took no issue with the fact that intended third-party beneficiaries were not specifically named within the agreement between the association and the oil and gas company, but rather with the homeowners' inability to show that they somehow belonged to the group of beneficiaries.[102] Nonetheless, the court noted that when a group of beneficiaries is properly designated and identified under the language of the contract, members of that group or class qualify as third-party beneficiaries.[103]

If it was, in fact, required that each and every Electing Entity be expressly named, Nabors would be forced to revise its arbitration agreement every time its rig crews began working on a new project for a new exploration and production company. By extension, this means Appellee, specifically, would have been required to re-sign his employer's DRP agreement every time his assignment changed over the course of his seventeen year employment. One can imagine the inefficiencies of such a system.

In oral argument at the trial court level, Appellee went so far as to acknowledge this fact, actually referencing "a little statement in the restatement of torts that says that **\*20** you don't necessarily have to name the third-party beneficiary in your agreement."[104] Nonetheless, Appellee went on to claim that despite this "little statement in the restatement of torts," the arbitration agreement *must* identify the third-party beneficiary so that "both parties know who it is."[105]

This position is incorrect. Both parties must intend that a third-party benefit from the agreement, but the third party need not be expressly identified by name.[106] Express intent to create a benefit for a third party is not the same as expressly identifying the party itself. The former is required to establish third-party beneficiary status; the latter is not. While it is true that third-party beneficiary status may be conferred when the party is specifically named in the agreement, express identification is not required to confer that status.[107] Further, to argue that the two concepts are one in the same is an over simplification of the law and a stretch of logic. There is no requirement that the parties intended that Appellant be a third-party beneficiary, only that Nabors

and Appellee intended that Electing Entities be given the direct benefit of arbitration. In other words, a meeting of the minds must exist as to the decision to benefit a third party, but not as to whom specifically that third party will be. [108]

A plain reading of the DRP for which Appellee signed an acknowledgment of receipt would have allowed Appellee to become aware that he was obliging himself to **\*21** arbitrate claims against Electing Entities (and that Electing Entities were obliged to arbitrate disputes against Appellee). For this reason, Appellee's argument as to whether Appellee knew that Appellant, specifically, was a third-party beneficiary is immaterial to the analysis of Appellant's status.

### iii. "Electing Entity" is Sufficiently Designated to Identify the Parties Benefitted

Appellee's exaggerated claim that any entity, anywhere in the entire world could be an electing entity fails both factually and logically. [109] As a matter of practicality, it would be far fetched and inappropriate to construe the terms of the DRP to cast such a wide net. Factually speaking, it would be impossible for an electing entity to include any entity in the entire world, as the DRP specifically defines "Electing Entity" in the arbitration agreement as a "legal entity who has agreed to be bound by the Program as provided herein." [110] This definition necessitates that a contractual relationship exist with Nabors, thus narrowing the scope of possible players to a discrete and limited group of legal entities who could foreseeably become elect to be bound by the DRP. [111]

A 2008 opinion from Beaumont Court of Appeals involves a set of facts similar to those of the present matter. *In re Citgo Petroleum Corporation* discussed a dispute resolution agreement between an employee and his employer which intended to confer **\*22** the benefit of arbitration upon third parties to the contract. [112] Also similar to the Nabors DRP, the agreement did not specifically name those third parties and instead described and designated a group of intended beneficiaries. [113] The agreement governed the resolution of all claims and disputes between (1) the employer and its employees; (2) employees and "customer[s] and clients" of the employer; and (3) employees and "the owner of any property upon which Employee had performed service[s] on behalf of Employer." [114] Ultimately, the Beaumont Court of Appeals held that, "[a]lthough the contract [did] not name Citgo specifically," it was "sufficiently clear to establish that the parties intended to cover entities in this category" of "customer or client," and because Citgo was a customer or client of the employer, Citgo was a third-party beneficiary. [115]

While the agreement did not expressly identify every customer or client, it sufficiently identified and designated the group of intended third-party beneficiaries by referring to "customers and clients generally." [116] Appellant argues that the language contained in the Nabors DRP does no more than "generally" "refer to" the intended group of third-party beneficiaries when designating the group. Contrary to Appellee's statements, the DRP provides a definition of "Electing Entity" and in doing so provides a narrow and limited class of parties who benefit from the arbitration agreement with Nabors employees.

**\*23** Furthermore, the *Citgo* court looked directly to the indemnification agreement between Citgo and the employer, stating that this "contractual duty to indemnify Citgo suggests one reason [Employer] would intend to give Citgo the right to enforce the arbitration agreement" that employees signed with their employer. [117] This supported the argument that the employer, Pat Tank, intended to confer the right to arbitrate to the refinery owner, Citgo, because a claim made by an employee against the refinery owner may ultimately, though indirectly, be paid by the employer under the indemnity contract. [118] Because this matter has been undertaken pursuant to a similar indemnity provision in the contract between Nabors and EnerVest, this same rationale applies.

### iv. Appellee's Reliance Upon In re Bayer Materialscience, LLC Ignores Factual Distinctions and Applicable Law.

While Appellant urges this Court to incorporate the *Citgo* holding, Appellee refers this Court instead to an earlier decision by the Houston First Court of Appeals. At the trial level, Appellee argued that *In re Bayer Materialscience LLC* supported his argument that Appellant was not a proper third-party beneficiary to the DRP. [119] In *Bayer,* employees of Brock Services, a scaffolding company, entered into a dispute resolution agreement as a condition to their employment and agreed to arbitrate any and all claims against their employer, as well as against Brock's "customers, clients and/or any other person(s) under contract" with Brock. [120]

**\*24** The *Bayer* court ultimately decided that Bayer, as a Brock customer and non-signatory seeking third-party beneficiary status, could not enforce the arbitration agreement against Brock employees. [121] In reaching its conclusion, the Court commented on three delinquencies in Bayer's argument: (1) the arbitration agreement failed to specifically name Bayer; (2) the arbitration agreement did not confer upon Bayer the right to enforce the agreement; and (3) Bayer was neither a creditor nor donee beneficiary. [122]

As to issue one, it is important to note that in applying the facts of *Bayer* against available case law, the Bayer court ignored precedent which permits a party not expressly named to qualify as a third-party beneficiary. [123] As discussed previously, evidence of intent may be shown by express identification, but need not be, so long as the party benefitted is sufficiently designated in the agreement. [124] As a factual matter, Bayer also did not show that a definitions portion to the arbitration agreement described or designated "customers" so that it was included in the class benefitted. [125] In contrast, the Nabors DRP does define "Electing Entity" so that Appellant is included. [126]

Regarding issue two, Appellee's reliance upon *Bayer* in showing that a party must intend to confer the right to enforce an arbitration agreement ignores another factual **\*25** distinction between *Bayer* and the present matter. [127] As the Beaumont court noted in *Citgo,* which paid distinct attention to *Bayer* due to the factual similarities between the two cases, an indemnification agreement is sufficient evidence intent of intent "to give Citgo the right to enforce the arbitration agreement." [128] No such indemnification agreement existed in *Bayer.* However, because an indemnification agreement exists between Nabors and EnerVest, a sufficient showing of intent to confer the right to enforce the arbitration agreement is present. [129]

Lastly, the *Bayer* court found that Bayer could not be a third party beneficiary to the contract between Brock and its employees because it was not a creditor beneficiary. [130] However, in doing so, the *Bayer* court looked to a vital fact which is again distinct from the present matter. [131] In *Bayer,* the agreement to arbitrate was essentially a one-way street in that Brock employees were required to arbitrate their disputes against Bayer, but Bayer was not required to arbitrate its disputes against Brock employees. [132]

By contrast, the Nabors DRP requires that Appellant, as an Electing Entity, arbitrate claims against Nabors employees just as it binds employees to arbitrate claims against Appellant. [133] This means that employees may enforce the arbitration agreement against an Electing Entity just as readily as an Electing Entity may enforce the agreement **\*26** against an employee. [134] Due to this discrepancy, Appellant qualifies as a creditor beneficiary where Bayer did not.

In essence, *Bayer* and *Citgo* examined strikingly similar factual scenarios. Because the facts of the present matter align more closely with the facts of Citgo, and because Bayer failed to incorporate case law allowing a party to be designated as a third party without specific identification of that party by name, Appellant urges this Court to adopt the rationale utilized in *Citgo* and, ultimately, the holding.

**C. Appellant May Enforce DRP Pursuant to the Doctrine of Incorporation by Reference**

To the extent this Court does not find that Appellant qualifies as a third-party beneficiary, Appellant is alternatively entitled to enforce the arbitration agreement against Appellee under the doctrine of incorporation by reference. [135]

"An unsigned paper may be incorporated by reference in a contract signed by a party sought to be charged. [136] "The specific language used is not important so long as the contract signed...plainly refers to another writing." [137] "When a document is incorporated into another by reference, both instruments must be read and construed together." [138] In other words, "under the doctrine of incorporation by reference, where one contract refers *27 to another contract or instrument, the second document may properly constitute part of the original contract. [139]

Because the DRP between Appellee and Nabors plainly refers to a separate writing, specifically, the contract between Nabors and Appellant, the DRP should be read with the Nabors-Appellant contract. [140] The Nabors-Appellant contract contains a provision designating Appellant as an Electing Entity. [141] Thus, when the DRP and the contract between Nabors and Appellant is read together, Appellant is incorporated by reference into the DRP between Nabors and Appellee. [142] As a result, Appellant, despite it being a non-signatory to the contract between Appellee and Nabors, may enforce the arbitration agreement as an Electing Entity under the DRP.

A plain reading of the DRP would have made Appellee aware that contracts exist between Appellee's employer, Nabors, and third-party companies for whom Nabors performs services. [143] As can be seen from the DRP, these companies are entitled to elect into Nabors's dispute resolution program. [144] Even if documentation indicating which companies are Electing Entities is not attached to the DRP, and even if Appellee never saw the contract between Appellant and Nabors, and even if Appellee was not a party to that contract, Appellee was nevertheless on notice that a contract existed between Nabors *28 and Appellant so that it was incorporated by reference into the DRP. ("Even if the Client Agreement was not attached to the New Account Form, and even if the Account Holders never saw the Agreement, and even if the Client Agreement was not signed, the Account Holders were nevertheless on notice that there was a Client Agreement.") [145]

Because the contract designating Appellant as an Electing Entity is incorporated into the DRP, "specifically advising" Appellee that those contracts designate Electing Entities, the contract was sufficiently incorporated by reference so that Appellant is, under an alternative theory allowing non-signatories to enforce arbitration agreements, entitled to bind Appellee to his agreement under the DRP. [146]

## D. The DRP Is Not Illusory, Unconscionable, or Lacking Mutual Assent.

An illusory promise of performance invalidates a bilateral contract. [147] A promise is illusory when it fails to bind the promisor who retains the option of discontinuing performance. [148] In the context of a stand-alone arbitration agreement, binding promises to arbitrate are required of both parties in order for the requirement of consideration to be met. [149] An arbitration agreement may be illusory if a party can unilaterally avoid the agreement to arbitrate. [150] Stated otherwise, an arbitration clause is not illusory unless one *29 party can avoid its promise to arbitrate by amending the provision or terminating it altogether. [151]

Appellee argued in his opposition to Appellant's Motion to Compel Arbitration and at the hearing on Appellant's Motion to Compel Arbitration that the DRP was illusory because an electing entity can unilaterally decide whether it wants to arbitrate any particular dispute with any particular individual. [152] Appellee further argued that the DRP allows Appellant, as an electing entity, to pick and choose the claims it wants to arbitrate. [153] Appellee goes so far as to argue that the electing entity language allows Appellant to unilaterally reserve the right to make changes to the arbitration agreement at any time. [154] In support of this argument, Appellee cites to *In Re: C&H News Company* out of the Corpus Christi Court of Appeals. [155] In *C&H*

the dispute involved an arbitration agreement that required employees to arbitrate all claims against the company. [156] The arbitration agreement referenced the employee handbook by stating that "arbitration would be provided in the handbook" and the handbook provided that the content therein "may and likely will be changed, modified, deleted or amended from time to time as the employer deems appropriate, with or without prior notification to employees." [157] The Court of Appeals held that this language, in essence, reserved the *30 right of the employer to unilaterally change the scope of the arbitration agreement. [158] Appellee would have this court believe that the circumstances in this case are essentially the same as in *C&H*. Stated another way, Appellee alleges that allowing the Electing Entity to decide what disputes it will arbitrate at the time it contracts to be bound by the DRP, in essence, reserves the right to Appellant to unilaterally change the scope of the arbitration agreement. [159] Such an argument is neither supported by the facts or the law.

The DRP defines "electing entity" as "any legal entity that has agreed to be bound by the program as provided herein." [160] Thus, a contracting entity such as Appellant becomes an electing entity when it agrees that it is bound by the program and its provisions. The DRP goes on to state that "election may be made only as to some types of disputes, or only as to some persons, in the discretion of the electing entity." [161] Thus, when a company such as Appellant becomes an electing entity it determines *at that time* to what extent it will be bound by the DRP. Thereafter, the contracting entity is bound to arbitrate all disputes it has so agreed to arbitrate.

Further, as noted above, this is a third party beneficiary contract, thus it is "not essential to the creation of a right and an intended beneficiary that he be identified when a contract containing a promise is made." [162] In this matter, Appellant did not agree to be bound by the DRP until it became an electing entity. On that date, Appellant agreed to be *31 bound by the DRP and to arbitrate all disputes within its provisions. Thereafter, any amendment and/or change to the DRP and/or Appellant's status as an electing entity would have to be made pursuant to the amendment provision found in the DRP (i.e. ten days notice would have to be given and the amendment would not have any effect on current proceedings). [163] This fact is important because the underlying rule of law in *In re C&H News Company* and its line of cases is founded in one party's retention of the right to change the agreement *after* all parties are bound by the agreement without notice, and as to even existing claims. Thus, contrary to Appellee's allegations, Appellant did not retain the right to unilaterally change or amend the arbitration agreement going forward. [164] In fact, after agreeing to be bound by the provision to whatever extent the agreement was made, Appellant's position was "locked in".

The Texas Supreme Court upheld a similar arbitration agreement in *In Re Palm Harbor*. [165] In that case, the Court analyzed an arbitration agreement between a buyer of a manufactured home on the one hand, and the retailer and manufacturer on the other. [166] The agreement contained an arbitration provision, which provision permitted the manufacturer to opt out of the arbitration agreement within twenty days. [167] When the buyer sued the manufacturer, the manufacturer sought to enforce the arbitration provision. [168] The plaintiffs sought to avoid arbitration by arguing that the manufacturer *32 could freely avoid the arbitration provision, the provision was illusory, and hence, unenforceable. [169] The Court held that by its own terms, the agreement the parties entered into was directly for the manufacturer's benefit and, while it recognized that an arbitration agreement may be illusory if a party can unilaterally avoid the agreement to arbitrate, it held that even in light of the opt out provision the agreement in that case was not illusory as to the manufacturer. [170]

In this matter, Appellant had no opportunity to opt out after agreeing to be bound by the DRP. In fact, Appellant could not by itself opt out, amend or change the arbitration agreement after agreeing to be bound by it. [171] Of great significance, no termination, alteration, or amendment of the DRP was effective or would apply to any proceeding already initiated. [172] Thus, it is clear that the promise made by Appellant when it agreed to be bound by the DRP was not illusory.

# CONCLUSION

As noted above, a valid agreement to arbitrate exists in this matter. Further, Appellee's claims fall within the scope of the DRP. The DRP requires that disputes between the Company (defined as Nabors, its subsidiaries, and any "Electing Entity") and its current or former employees be submitted to arbitration. According to Appellee's Second Amended Petition, Appellee was an employee of a Nabors' subsidiary and was injured while in the course and scope of his employment. Appellee has not disputed that **\*33** he was employed by NWS, which is a Nabors' subsidiary. Nor has he disputed that he alleges he was injured at the workplace and/or in the course and scope of his employment. Further, Appellant is a proper third party beneficiary of the DRP and its promise to be bound by the DRP is not illusory. Based on the factual allegations of Appellee's Petition, this dispute between Appellee and Appellant (an "Electing Entity"), falls squarely within the scope of the DRP. Consequently, Appellant's Motion to Compel Arbitration should have been granted and this case should have been abated or dismissed and compelled to final and binding arbitration. The court below abused its discretion in the absence of any basis in law to deny the Motion to Compel Arbitration.

# PRAYER

Appellant respectfully prays that this Court vacate the trial court's November 15, 2011 order, grant Appellant's Motion to Compel Arbitration, and compel the parties to arbitration. Appellant requests all further relief to which it is entitled.

**Appendix not available.**

Footnotes

1       Supplemental CR.

2       CR 99.

3       Id.

1       *See* Plaintiff's Second Amended Petition.

2       *See id.*

3       CR 20 - 39.

4       CR 21 and 24 at ¶¶ 2(C) and 8. The Federal Arbitration Act, 9 U.S.C. § 2, applies in state courts and preempts state anti-arbitration laws to the contrary. *See Circuit City Stores, Inc. v. Adams,* 121 S. Ct. 1302 (2001); *Southland Corp v. Keating,* 465 U.S. 1, 16 (1984); *see also Palm Harbor Homes v. McCoy,* 944 S.W.2d 716, 721 (Tex.App. --. Worth 1997) (holding that FAA preempted Texas Arbitration Act's requirement that party's attorney sign agreement). Although the FAA preempts state arbitration laws, courts still must resort to general state law contract principles to determine whether an arbitration agreement will be enforced.

5       CR 21 at ¶ 1.

6       "Dispute" means all legal and equitable claims, demand and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons bound by the Program or by an agreement to resolve Disputes under the Program, or between a person bound by the Program and a person or entity otherwise entitled to its benefits, including, but not limited to, any matters with respect to...6. any personal injury **allegedly incurred in or about a Company Workplace or in the course and scope of an Employee's employment.** CR 21 at ¶ 2(E) (emphasis added).

7       CR 21 at ¶ 2(D).

8       CR 16 at ¶ 4; CR 23 at ¶ 2(L).

9       *Id.*

10      *Id.*

11      CR 16 - 17 at ¶¶ 7 through 9; CR 45 at General Terms and Conditions, Paragraph VII.

12      CR 17 at ¶9; CR 45.

13      CR 17 at ¶ 11; CR 46.

14      *Id.*

15      CR 17 at ¶ 12; CR47.

16    *Id.*

17    *Id.*

18    CR 87 - 88.

19    CR 4 - 71.

20    CR 99.

21    CR 73 -74.

22    Civil Practice and Remedies Code § 171.098(a)(1).

23    Texas Rule of Appellate Procedure 28(a).

24    *J.M. Davidson, Inc. v. Webster,* 49 S.W.3d 507, 511 (Tex.App.-Corpus Christi, 2001; ANCO *Ins. Services of Houston, Inc. v. Romero,* 27 S.W.3d 1, 5 (Tex.App.-San Antonio, 2000).

25    *Jackson v. Van Winkle,* 660 S.W.2d 807, 810 (Tex. 1983), overruled in part on other grounds by *Moritz v. Preiss,* 121 S.W.3d 715, 721 (Tex. 2003).

26    *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex. 1991).

27    *In re American Homestar of Lancaster, Inc.,* 50 S.W.3d 480, 483 (Tex. 2001).

28    *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992).

29    *Tenet Healthcare Ltd. v. Cooper,* 960 S.W.2d 386, 388 (Tex. App. - Houston [14th Dist.] 1998, pet. dism'd w.o.j.); *City of Alamo v. Garcia,* 878 S.W.2d 664, 665 (Tex. App. - Corpus Christi 1994, no writ).

30    *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 573 (Tex. 1999) (orig. proceeding).

31    *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 269 (Tex. 1992) (orig. proceeding).

32    *See Circuit City, 532 U.S. 105; Cantella & Co. v. Goodwin,* 924 S.W.2d 943 (Tex. 1996); *Tipps,* 842 S.W.2d at 268.

33    *Cantella & Co., Inc. v. Goodwin,* 924 S.W.2d 943, 944 (Tex., 1996); *Shearson Lehman Bros., Inc. v. Kilgore,* 871 S.W.2d 925, 928 (Tex.App. - Corpus Christi, 1994, orig. proceeding).

34    CR 21 and 24 at ¶¶ 2(C) and 8.

35    CR 18 at ¶¶ and 16

36    *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 91 (Tex. 1996).

37    *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353-54, 87 L.Ed.2d 444 (1985); *Folse v. Richard Wolf Medical Instruments Corp.,* 56 F.3d 603, 605 (5th Cir.1995); *R.M. Perez & Assocs., Inc. v. Welch,* 960 F.2d 534, 538 (5th Cir.1992).

38    *See In re D. Wilson Constr. Co.,* 196 S.W.3d at 781 (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)); 9 U.S.C.A. § 1 et seq.; Civil Practice & Remedies Code § 171.001 et seq.

39    *Dallas Cardiology Assoc., P.A. v. Mallick,* 978 S.W.2d 209, 212 (Tex. App. - Dallas, 1998, pet. denied).

40    *In re Jim Walter Homes, Inc.,* 207 S.W.3d 888 (Tex. App. - Houston [14th Dist.] 2006).

41    *Id.*

42    *Associated Glass, Ltd. v. Eye Ten Oaks Invs., Ltd.,* 147 S.W.3d 507, 511 (Tex. App - San Antonio 2004, no pet.).

43    *See In re Halliburton,* 80 S.W.3d 566 (Tex. 2002); *In re Dallas Peterbilt, Ltd., L.L.P.,* 196 S.W.3d 161, 162 (Tex. 2006).

44    *See id.*

45    *See id.* at 569-71.

46    *In re RRGT, Inc.,* 2006 WL 622736 (Tex. App. - San Antonio 2006, orig. proceeding).

47    *See Nabors Drilling USA, LP v. Carpenter,* 198 S.W.3d 240, 249 (Tex. App. - San Antonio 2006, orig. proceeding).

48    CR 17. at ¶¶ 11 and 12; CR 46 and 47.

49    *Id.*

50    *See In re Bunzl USA,* 155 S.W.3d 202 (Tex. App. - El Paso 2004, orig. proceeding).

51    CR 50 - 51.

52    CR 54 at ¶ F.

53    CR 58.

54    CR 45.

55    *See In re Palm Harbor Homes,* 195 S.W.3d at 676.

56    Supplemental CR.

57    CR 20 - 39

58    *Prudential Secs., Inc. v. Marshall,* 909 S.W.2d 896, 899 (Tex.1995); *Ikon Office Solutions, Inc. v. Eifert,* 2 S.W.3d 688, 697 (Tex. App. - Houston [14th Dist.] 1999, orig. proceeding); *Prudential-Bache Secs., Inc. v. Garza,* 848 S.W.2d 803, 807 (Tex. App.-Corpus Christi 1993).

59    CR 16 -17 at ¶¶ 6, 10 through 13; CR 48 at ¶3; *see also* Supplemental CR.

60    *See* Supplemental CR.

61    CR 17 at ¶ 12; CR 47

62    CR 20 - 39.

63    CR 21 at ¶1.

64    CR 21 at ¶ 2(E).

65    CR 21 at ¶ 2(D).

66    CR 16 - 17 at ¶ 4 and ¶¶ 6 through 9; CR 23 at ¶ 2(L); CR 45 at ¶ VII.

67    *See Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 528 (5th Cir.2000) (noting that "arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory").

68    *In re Labatt Food Service, L.P.,* 279 S.W. 3d 640 (Tex. 2009); *In re: Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 739 (Tex. 2005).

69    *In re Rolland,* 96 S.W.3d 339, 344 (Tex. App. - Austin 2001, orig. proceeding).

70    *Bridas S.A.P.I.C. v. Gov't of Turkmenistan,* 345 F.3d 347, 355, 358 (5th Cir.2003).

71    334 S.W.3d 220, 226 (Tex., 2011).

72    *Id.* at 224.

73    *Id*

74    *Id*

75    *Id.*

76    *Id.*

77    *In re Rubiola,* 334 S.W.3d 222.

78    *Id.* at 222 - 223.

79    *Id.* at 223.

80    *Id.*

81    *Id.*

82    *Id.*

83    *In re Rubiola,* 334 S.W.3d at 224.

84    *Id.*

85    *Id.*

86    *Id.*

87    *Id* at 224 - 225.

88    *Id.* at 225.; (referencing *Sherer v. Green Tree Servicing LLC,* 548 F.3d 379, 382 (5th Cir., 2008) (noting that trial court's application of equitable estoppel to determine whether non-signatory might compel arbitration, was unnecessary because the terms of the Loan Agreement clearly identify when a party might be compelled to arbitrate with a non-signatory); Bridas, 345 F.3d at 356 (noting that ordinary principles of contract and agency law may be called upon to bind a non-signatory to an agreement whose terms have not clearly done so); *see also* Carolyn Lamm, *Defining The Party - Who is a Proper Party in an International Arbitration Before the American Arbitration Association and Other International Institutions,* 34 Geo. Wash. Int'l L.Rev. 711, 720 (2003) (noting that courts prohibit enforcement by non-signatories "where (1) the contract does not expressly grant third parties the ability to participate in the arbitration; (2) the parties have not contemplated the idea; and (3) non-signatory involvement would constitute an invasion of the consensual nature of arbitration.").

89    CR 17 at ¶ 9.

90    CR 17 at ¶ 9; CR 45.

91    *Id.*

92    *See In re Rubiola, supra.*

93    *Black & Vernooy Architects v. Smith,* 2011 WL 3435679 (Tex. App. - Austin Aug. 5, 2011, no pet. h.) (quoting *Stine v. Stewart,* 80 S.W.3d 586, 589 (Tex. 2002)).

94    *Stine,* 80 S.W.3d at 591 ("a third-party beneficiary does not have to show that the signatories executed the contract solely to benefit her as a non-contracting party"); *Maddox v. Vantage Energy, LLC,* ---S.W.3d ---, 2012 WL 407269, at *3 (Tex. App. - Fort Worth

Feb. 09, 2012, no pet. h.) ("the third-party beneficiary need not be specifically named in the contract but must be otherwise sufficiently described or designated.").

95     *See Stine,* 80 S.W.3d at 589 ("third-party beneficiary status may not be created by implication"); *see also Loyd v. ECO Res., Inc.,* 956 S.W.2d 110, 134 (Tex. App. - Houston [14th Dist.] 1997, no pet.) ("the fact that a person is directly affected by the parties' conduct... does not make him a third-party beneficiary").

96     *Stine,* 80 S.W.3d at 589 (emphasis added); *MCI Telecomms. Corp. v. Tex. Util. Elec. Co.,* 995 S.W.2d 647, 651 (Tex 1999)

97     *See Stine,* 80 S.W.3d at 589.

98     CR 24 at ¶6; CR 26 at ¶10.

99     *See Maddox,* 2012 WL 407269, at *3.

100     *See Id.*

101     *Id.* at *4.

102     *Id.; see e.g. Tawes v. Barnes* 340 S.W.3d 419 425 (Tex. 2011).

103     *See id.; Tawes,* 340 S.W.3d at 425; *In re Citgo Petroleum Corp.,* 248 S.W.3d 769, 776 (Tex. App. - Beaumont 2008, orig. proceeding).

104     RR 15:7-12 (referencing Restatement (Second) of Contracts § 308).

105     *Id.*

106     *See Maddox,* 2012 WL at, *3; *In re Citgo Petroleum Corp.,* 248 S.W.3d at 776.

107     *See Citgo Petroleum Corp.,* 248 S.W.3d at 776.

108     *See In re Citgo Petroleum Corp.,* 248 S.W.3d at 776 ("Identification of an intended beneficiary is made at the time enforcement of the right is sought."); Restatement (Second) of Contracts § 308.

109     RR p. 10:20-24.

110     CR 22 at ¶F.

111     *See e.g. Nelson v. Louisiana Electric Rig Service,* 2006 WL 5671234, *4 (C.D. Cal. Feb. 22, 2006) ("Because the agreement signed by Plaintiff defined Electing Entities and included them, [Defendant] was included by reference.").

112     248 S.W.3d at 770.

113     *Id.*

114     *Id.* at 775.

115     *Id.* at 776.

116     *See id.*

117     *Id.* at 777 ("A claim made by a Pat Tank employee against Citgo may ultimately, though indirectly, be paid by Pat Tank under the indemnity contract.").

118     *Id.*

119     265 S.W.3d 452 (Tex. App. - Houston [1st Dist.] 2007, orig. proceeding).

120     *Bayer,* 265 S.W.3d at 453.

121     *Id.* at 458.

122     *Id.*

123     *See id.; Cf. Knox v. Ball,* 191 S.W.2d 17, 23 (Tex. 1945).

124     *See* Restatement (Second) Of Contracts § 308.

125     *See Bayer,* 265 S.W.3d at 456.

126     CR 26 at ¶11.

127     *See MJR Corp. v. B & B Vending Co.,* 760 S.W.2d 4, 16 (Tex.App.-Dallas 1988, writ denied) (holding that the maker of a contract must have intended for the third-party beneficiary to have the right to enforce the agreement).

128     *Citgo,* 248 S.W.3d at 777.

129     *See id.*

130     *Bayer,* 265 S.W.3d at 456.

131     *Id* at 457

132     *Id*

133     CR 24.

134     *See id.*

135     *See Kellogg Brown,* 166 S.W.3d at 739 (there are "six theories... that may bind non-signatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary.")

136  *In re C & H News Co.,* 133 S.W.3d 642, 645 (Tex. App. - Corpus Christi 2003, orig. proceeding) (citing *Teal Constr. Co./Hillside Villas Ltd. v. Darren Casey Interests, Inc.,* 46 S.W.3d 417, 420 (Tex. App. - Austin 2001 pet. denied); *Owen v. Hendricks,* 433 S.W.2d 164, 166 (Tex. 1968)).

137  *C & H News Co.,* 133 S.W.3d at 645; *Teal Constr. Co.,* 46 S.W.3d at 420.

138  *C & H News Co.,* 133 S.W.3d at 645-46; *Wolfe v. Speed Fab-Crete Corp. Int'l,* 507 S.W.2d 276, 278 (Tex. Civ. App. - Fort Worth 1974, no writ).

139  *Cappadonna Elec. Management v. Cameron County,* 180 S.W.3d 364, 373 (Tex. App. - Corpus Christi 2005, no pet.) (citing *City of Port Isabel v. Shiba,* 976 S.W.2d 856, 858 (Tex. App. - Corpus Christi 1998, pet. denied).

140  *See C & H News Co.,* 133 S.W.3d at 645-46; *In re Raymond James & Associates, Inc.,* 196 S.W.3d 311, 319 (Tex. App.--Houston [1 Dist.] 2006 no et.)

141  CR 45 at ¶ VII.

142  *Raymond James & Associates, Inc.,* 196 S.W.3d at 319.

143  CR 21.

144  CR 26.

145  *See Raymond James & Associates, Inc.,* 196 S.W.3d at 319.

146  *Id.* at 320.

147  *Light v. Centel Cellular Co. of Tex.,* 883 S.W.2d 642, 645 (Tex.1994), *modified by Alex Sheshunoff Mgmt. Servs., v. Johnson,* 50 Tex. Sup.Ct. J. 44, 2006 WL 2997287 (Tex. Oct. 20, 2006).

148  *Id.*

149  *In re AdvancePCS Health L.P.,* 172 S.W.3d 603, 607 (Tex. 2005) (orig. proceeding).

150  *See In re Palm Harbor Homes, Inc.,* 195 S.W.3d at 677; *D.R. Horton, Inc. v. Brooks,* 207 S.W.3d 862, 867 (Tex.App. - Houston [14 Dist.], 2006) ("An illusory promise is one that fails to bind the promisor because he retains the option of discontinuing performance without notice.").

151  *In re 24R, Inc.,* 324 S.W.3d 564, 567 (Tex., 2010) (citing *Halliburton,* 80 S.W.3d at 570)).

152  RR p. 26:3 - 9; CR 84.

153  CR 84.

154  *Id.*

155  *Id.*

156  133 S.W.3d 642 (Tex.App. - Corpus Christi, 2003).

157  *Id.* at 646.

158  *Id.* at 647.

159  CR 84.

160  CR 22.

161  CR 26

162  *See* Restatement (Second) Of Contracts, Section 308 (1981).

163  CR 56 at ¶ 6.

164  *See In re* 24R, supra.

165  195 S.W.3d 672 (Tex., 2006).

166  *Id.* at 718.

167  *Id.*

168  *Id.*

169  *Id.*

170  *Id.* at 724.

171  CR 56 ¶ 6.

172  *Id.*

**End of Document**                                             © 2015 Thomson Reuters. No claim to original U.S. Government Works.